**STATE of Missouri, Respondent,**

v.

**Bobby LANE, Appellant.**

**No. 56138.**

Supreme Court of Missouri,
Division No. 2.

Dec. 13, 1971.

Motion for Rehearing or to Transfer to Court
En Banc Denied Jan. 10, 1972.

John C. Danforth, Atty. Gen., Kermit W. Almstedt, Asst. Atty. Gen., Jefferson City, for respondent.

James L. McMullin, Legal Aid and Defender Society of Greater Kansas City, Kansas City, for appellant; John J. Cosgrove, Public Defender, of counsel.

HENLEY, Judge.

Bobby Lane (hereinafter defendant) was charged with first degree murder as a result of the killing of Ronald Dee Yoakum. Section 559.010.[1] Defendant, with the assent of the court, waived trial by a jury. Rule 26.01; Article I, § 22(a), Constitution of Missouri, V.A.M.S. The case was submitted on evidence offered by the state; the defendant offered no evidence. The court found defendant guilty as charged and sentenced him to imprisonment for life. Section 559.030. Defendant appeals.

The primary point on appeal is that the court erred in overruling defendant's motion for judgment of acquittal, because there was not sufficient evidence to sustain the conviction. We hold the evidence to be sufficient and affirm the judgment.

Mildred Lewis, resident manager of an apartment house at 3607 Paseo in Kansas City, Missouri, testified that on the evening of November 26, 1968, at about 9:30

1. All references to sections are to RSMo 1969 and V.A.M.S.; references to rules are to Rules of Criminal Procedure and V.A.M.R.

o'clock, defendant came to her apartment on the first floor asking for a key to apartment No. 307 on the third floor; that defendant had been a tenant of apartment No. 307, but had been given a notice to vacate; that she told him she did not have a key; that she also told him that if he had anything in that apartment he should get it out; that a man later identified as Carl Primous was with defendant on that occasion and that shortly thereafter she heard the two men walking up the front stairway; that a few minutes later two girls who lived in an apartment on the third floor came to the first floor and told her that someone was breaking into apartment No. 307; that she called the police and reported the break-in; that within a few minutes Officer William Mynatt responded to the call and she let him in the building and walked up the stairs with him; that as they approached the third floor she saw defendant and Primous, each with a knife in his hand, standing at the top of the stairs facing her and the officer; that she stopped and returned to her apartment to call for more police; that she told her husband, Fletcher Lewis, that the officer needed help and then called the police; that her husband got his shotgun and went down the hall toward the back stairs; that while she was still on the telephone with the police she heard a shot and then a "blast" from a shotgun; that as she finished the telephone call a tenant across the hall from her unlocked the apartment building front door to let in Police Officers Ronald Dee Yoakum and Frederic Smith; that later she opened her door and looked out in the hall and saw defendant and Primous "coming down the hall" with Lane in the lead; that defendant had a gun in his hand; that he and Officer Yoakum started to "scuffling" on the floor across the hall from her apartment and she closed her door.

Officer William Mynatt testified that he went to the apartment house at 3607 Paseo on the evening of November 26, 1968, in response to a call that prowlers were breaking into an apartment in the building; that he arrived alone at about 9:45 P.M. and was directed to the third floor of the building; that he walked up the front stairway with his service revolver in his right hand; that when he reached a point about five steps below the third floor he saw defendant standing in the hallway at the top of the stairs holding a table knife; that he told defendant to drop the knife and he did; that as he proceeded up the steps he saw Primous in the hallway with a butcher knife in his hand; that when he told Primous to drop the knife Primous lunged at him and grabbed the officer's hand and service revolver; that defendant lunged at him at the same moment and also grabbed the revolver; that they fought over the revolver and he landed on the floor on his back with the revolver still in his hand; that they continued to fight him for the gun and Primous kicked him in the head which so "jarred" him that they gained possession of the revolver; that he looked up to see Primous and defendant standing directly in front of him; that Primous had the revolver and was pointing it at his head; that defendant said to Primous: "Leave him alone, let's get out of here"; that the two men then turned and ran down the front stairway; that as they left the third floor Primous was in the lead and still had possession of the revolver; that he saw no gun in defendant's hand. He further testified that he got up and went to one of the third floor apartments and called the Police dispatcher to report what had occurred; that while he was making this report he heard several shots and glass breaking in the building; that after making his report he went back out in the hall where he saw the two knives still on the floor where he and the two men had been fighting; that he also saw splinters lying on the floor below the service door to apartment No. 307 and the door standing partially open. He further testified that after being relieved of his watch of the physical evidence on the third floor, he went to the first floor where he saw Primous' body lying in the hall about 10 or 12 feet from the front door; that he also saw his re-

volver on the floor approximately one foot from Primous' left hand.

Fletcher Lewis, husband of the resident manager of the apartment house, testified that when his wife returned to their apartment to call for more police officers, she told him that Officer Mynatt needed help; that he got his shotgun and went to the second floor by way of the back stairs; that when he got to the second floor, he walked toward the front stairs and as he arrived there he saw defendant and Primous coming down the stairs; that as they reached the second floor, defendant stopped momentarily, told him (Lewis) to " * * * stay out of this * * *" and turned in behind Primous to go to the first floor; that as defendant stepped off onto about the second step below the second floor level, he turned and fired a gun at him striking him in the right chest; that he fired the shotgun at defendant as the latter ran down the steps toward the first floor. He further testified that after he fired the shotgun, he heard several shots on the first floor and that he returned down the back stairs.

Officer Frederic Smith testified that on the evening of November 26, 1968, near 10:00 o'clock, he responded to a police call to go to an apartment house at 3607 Paseo; that he and Officer Ronald Yoakum arrived there at the same time and went to the front door together; that he heard a shot inside before they could get in and as Officer Yoakum was stepping in and holding the door open for him, he heard another shot; that as he stepped in, Yoakum moved further in and to his right and he saw Primous and defendant, with the latter in the lead, running down the front stairway; that as he and Yoakum moved toward the stairway, defendant jumped from about the third step up from the floor onto Officer Yoakum and they fell to the floor, wrestling; that Primous had a black automatic pistol in his hand, but that he did not see a pistol in defendant's hand; that Pri-

mous appeared to fall when he reached a point almost at the bottom of the stairs and he landed on the floor in a sitting position and facing him. He further testified that when Primous landed on the floor he pointed the automatic toward Officer Yoakum and defendant, and he (Smith) heard a shot; that when he heard this shot he fired a shot at Primous, who fell back and then raised up again; that as he raised up, Primous again pointed his automatic toward Officer Yoakum and defendant, and he (Smith) heard another shot; that he then fired another shot at Primous, after which Primous got up off the floor; that as Primous got off the floor he appeared to be picking up something at the bottom of the steps with his left hand and then he turned and ran toward the rear of the building, but when he had taken only four or five steps (twelve or so feet), he stopped, turned, and pointed the automatic at him (Smith); that he could hear Primous' automatic "clicking", but apparently not firing; that as Primous was turning and attempting to fire at him, he (Officer Smith) was running up the stairs and at the same time firing at Primous; that Primous fell to the floor and as he did, he (Smith) looked toward where he had last seen defendant and Officer Yoakum fighting; that he saw that they had separated, that Officer Yoakum's body was on the floor, and that defendant was then running up the steps toward him (Smith); that defendant grabbed his service revolver and right hand with both his hands and they struggled for possession of the revolver as they moved down the steps and across the floor to near the front door when other officers arrived and helped to subdue defendant. He further testified that during this melee on the first floor he was shot in his upper left arm at sometime by someone, but he was not aware of being hit at the moment it happened; that during the melee he looked several times in the direction toward where defendant and Officer Yoakum were fighting; that Yoakum's back was toward Primous each time

Primous pointed the automatic toward defendant and Yoakum; that he "heard" a shot fired each time he saw Primous point the automatic in the direction of the officer and defendant, but he now knows that the shots he heard could not have come from the automatic because later examination by an expert showed that this weapon had not been fired that night.

Officer Joe McCune testified that he responded to a call to go to 3607 Paseo on the night of November 26, 1968; that when he arrived the shooting had ended; that he saw Carl Primous lying on his back in the hallway; that Primous was not moving; that Primous had a black automatic pistol in his right hand and that he kicked the gun out of Primous' hand.

Harry Brashier, a firearms expert of the Kansas City Police Department, testified that he examined and test-fired four weapons and examined certain bullets, shells and shell casings that were involved in the shooting at 3607 Paseo on the night mentioned in evidence; that his examination of Primous' black automatic pistol disclosed that one of the cartridges had a shallow indentation or imprint of a firing pin in the primer portion a little off center indicating a misfire; therefore the pistol was not fired on that occasion; that Officer Mynatt's service revolver had been fired six times; that the three bullets removed from Officer Yoakum's body were fired from Officer Mynatt's revolver; that Officer Yoakum's revolver had been fired once; that Officer Smith's revolver had been fired four times.

■ We review this case as though it had been tried before a jury and a verdict of guilty rendered, the finding of the court having the same force and effect as the verdict of a jury. If there is substantial evidence to support the finding it should be affirmed. State v. Clark, Mo., 438 S.W.2d 277, 279–280 [5, 6]; State v. Haislip, Mo., 411 S.W.2d 81, 83 [1, 2]; Rule 26.01(b).

There is substantial evidence from which the trial judge, as trier of the facts, reasonably could find that Officer Mynatt's revolver changed hands from Primous to defendant in their flight down the stairs and that defendant, in his fight with Officer Yoakum on the first floor, personally used the revolver to shoot and kill Officer Yoakum.

Defendant contends that the evidence is conclusive that Primous had possession of Officer Mynatt's revolver at all times and that, therefore, it was Primous who shot and killed Officer Yoakum while the officer and defendant were fighting. He further contends that there is no evidence that " * * * he and Primous acted jointly or confederated together to do either Mynatt or Yoakum [or Officer Smith] harm, nor any evidence that * * * [he] knew that Primous intended to shoot Yoakum"; that he may not be held responsible for the acts of Primous, because it has not been shown that he aided, abetted, authorized or directed those acts. He argues that the evidence shows that, to the contrary, he acted to prevent Primous from shooting Officer Mynatt on the third floor when he told Primous to "[l]eave him alone, let's get out of here," and that he acted to prevent harm by Primous to Officers Yoakum and Smith on the first floor when he jumped from the stairs onto Yoakum.

In support of his contention that he may not, under his version of the facts, be held responsible for the acts of Primous he cites State v. Stemmons, Mo., 262 S.W. 706, and other cases.[2] In *Stemmons*, the defendant, an attorney, was angered by remarks of the deceased in court. They

---

2. State v. Mull, 318 Mo. 647, 300 S.W. 511; State v. Thompson, 293 Mo. 116, 238 S.W. 786; State v. Odbur, 317 Mo. 372, 295 S.W. 734; State v. Recke, 311 Mo. 581, 278 S.W. 995.

fought and fell to the floor. Jackson, defendant's client, rushed in and kicked deceased on the head, inflicting a fatal wound. On appeal this court held that there was no evidence tending to prove that defendant shared in Jackson's criminal intent, or that he aided or abetted him in his assault on the deceased. 262 S.W. at 707. In discussing the applicable law, the court quoted with approval from State v. Porter, 276 Mo. 387, 207 S.W. 774, 776: "To render one an aider or abettor and, as a consequence, guilty in like degree with the principal in the commission of a crime, there should be evidence of his knowledge of the intention or purpose of the principal to commit the assault. In other words, there must have been a 'common purpose,' by which is meant a like criminal intent in the minds of * * * [the principal] and the appellant, to render the latter guilty as charged * * *."

■ Assuming for the purpose of discussion only, that the facts are as contended by defendant, i. e., that Primous had Mynatt's revolver and shot and killed Officer Yoakum as defendant and Yoakum were fighting, there is still sufficient substantial evidence to sustain a finding that defendant was guilty either as a principal or as an aider and abettor. The trier of facts reasonably could find that the killing of Officer Yoakum during a fight with defendant was a part of one continuous episode and the result of a joint effort and common purpose of defendant and Primous to escape, by use of whatever means necessary, after their joint assault upon and robbery of Officer Mynatt, and defendant's shooting of Fletcher Lewis in the course of their flight down the stairway. State v. Ramsey, Mo., 368 S.W.2d 413, 416–418 [2–7]; State v. Irby, Mo., 423 S.W.2d 800 [3, 4]; State v. Engberg, Mo., 376 S.W.2d 150, 155–157 [2].

The judgment is affirmed.

All of the Judges concur.