UNITED STATES of America ex rel.
Arthur DALE H-5302

v.

N. A. WILLIAMS, Superintendent, S. C. I.,
Huntingdon.

Mark Sendrow, Assistant District Attorney, as representative of the Office of the District Attorney of Philadelphia, Appellant.

No. 71-1376.

United States Court of Appeals,
Third Circuit.

Argued March 6, 1972.

Decided May 3, 1972.

Mark Sendrow, Asst. Dist. Atty., Philadelphia, Pa., for appellant.

John W. Packel, Chief, Appeals Div., Defender Assoc. of Phila., Philadelphia, Pa., for appellee.

Before BIGGS, VAN DUSEN and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (February 24, 1972), holds that when the reliability of a witness may be determinative of guilt or innocence the failure of the prosecution to correct false evidence of that witness is an error of due process dimension. This appeal by Pennsylvania from the grant of a writ of habeas corpus based on alleged false testimony by a prosecution witness in a state proceeding requires us to decide two questions:

1. Was there false evidence in the context of *Giglio* and the seminal case of Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)?

2. If so, could this false testimony "in any reasonable likelihood" have af-

fected the judgment of the fact finder, *Giglio, supra,* 405 U.S. at 154, 92 S.Ct. at 766?

An affirmative answer to both these questions would require that the appeal be denied.

On February 1, 1966, Joseph Charles, then 16 years of age, and indicted for robbery, conspiracy, aggravated assault and battery, and rape, changed his plea from not guilty to guilty before Judge Raymond Pace Alexander. The following colloquy transpired:

> MR. SPRAGUE (D.A.): That, sir, would summarize in this plea of guilty the testimony that the Commonwealth desires to present. I have been advised that since this proceeding started, as Your Honor heard, no offer, no deal or commitment of any sort was offered to this defendant, and the Commonwealth was ready to proceed to trial at this time.
>
> I have been advised that the defendant now desires to cooperate with the Commonwealth and to testify for the Commonwealth, at the same time reiterating that he will have no deal or commitment. And I would ask at this time that sentence be deferred.
>
> THE COURT: I would like to ask, has he named or have you been able to ascertain the identities of the other young men in this?
>
> MR. SPRAGUE: May I say that other persons are under arrest and are awaiting trial. I have told counsel and the defendant if the Court sees fit to defer sentence, I am going to have Mr. Alessandroni and Detective Winchester speak with the defendant and find out the extent of his testimony and his availability to the Commonwealth.
>
> THE COURT: Let him stand up at the bar of the court.
>
> BY THE COURT:
>
> Q. You are Joseph Charles?
>
> A. Yes.
>
> Q. You have heard the testimony from this lady here, Mrs. Lynch, today?
>
> A. Yes.
>
> Q. You pled guilty to that?
>
> A. Yes.
>
> Q. Aren't you shocked beyond words at the horrible crime that was committed upon this woman?
>
> A. Yes.
>
> Q. And participated in by you?
>
> A. Yes.
>
> THE COURT: I think nothing has ever appeared in this courtroom either before me or any other judge that is so revolting to the human heart and soul and mind. It is the most awful thing I have ever heard from any witness stand or ever read about. I don't see how a human being could force another person, a woman, an inoffensive, unoffensive woman, into such a horrible experience as this.
>
> How do you account for a thing like this? I warn you that a severe sentence awaits you but I am acceding to the District Attorney's request to defer sentence and perhaps I should because I am excited about this. I have a sense of revulsion about this crime to this innocent woman.
>
> You will have an opportunity to reduce some of this. No promise has been made to you by anyone up to now and no promise by this Court, but a suggestion to you, that you ought to be man enough to name the other five. Will you do so?
>
> THE DEFENDANT: Yes.
>
> THE COURT: You promise the Court you are going to name those five men to this detective and do it today. Give them every bit of names, addresses, nicknames and everything else and what they did. It may save you many, many long years. Don't involve anybody if it isn't true, but tell the truth on all of them. If you do, you will be given consideration.

Before Charles was sentenced, he was called as a Commonwealth witness in the trial of Arthur Dale, also charged with the same offenses arising out of a brutal

gang rape of a Philadelphia crossing guard. Dale had waived trial by jury. The fact finder was Judge Theodore J. Reimel, a colleague of Judge Alexander.

Charles was asked: "Have any promises or deals been made to you by the Commonwealth, or anyone else, in return for your testimony?" Answer: "No."

It is on the basis of this question and answer that the Commonwealth is charged with permitting false evidence to stand uncorrected. It is contended that a promise or a deal was in fact extended to him in exchange for his testimony, and that Dale is therefore entitled to habeas relief.

The issue is not free from doubt. Tending to establish the relator's case is Judge Alexander's statement to Charles:

> You will have an opportunity to reduce some of this. . . . You promise the Court you are going to name those five men to this detective and do it today. Give them every bit of names, addresses, nicknames and everything else and what they did. It may save you many, many long years. Don't involve anybody if it isn't true, but tell the truth on all of them. If you do, you will be given consideration.

Militating against him are these factors: The district attorney three times stated that no promise or deal would be extended to him; Judge Alexander explicitly stated: "No promise has been made to you by anyone up to now and no promise by this Court, but a suggestion to you." Moreover, at best, the judge's request was for him to name the other five participants. There was no request that he testify against them.

Technically speaking, there was no untruthfulness in Charles' response. This 16-year old youth was faced with a disclaimer by the district attorney of any "promise or deals;" a disclaimer by the judge of a "promise;" and although Mr. Sprague spoke of "his testimony," the court addressed itself only to the request that he furnish the detective with the names of the other participants. And this, of course, makes the issue difficult to resolve. Could a court, for example, sustain a charge of perjury against Charles on the basis of a comparison of the February 15 negative response with the February 1 colloquy? Was this indeed a false statement? We have strong doubts that it was, especially when compared to the blatant inconsistencies in *Giglio*, in which an explicit promise by an assistant United States attorney that in exchange for grand jury testimony the witness would not be prosecuted was specifically denied by the witness at trial, or in *Napue* where the false statement was a specific denial of an explicit promise of a reduced sentence.

In *Giglio*, moreover, "the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury." 405 U.S. at 154, 92 S.Ct. at 766. Similarly in *Napue*: "[the witness] Hamer's testimony was extremely important. . . . On the basis of the evidence presented, which consisted largely of Hamer's testimony, the jury returned a guilty verdict. . . ." 360 U.S. at 266, 79 S.Ct. at 1175.

■ Here, the testimony of Charles was merely corroborative of the testimony of the victim herself who, unfolding a story of brutality and animalism rarely ever recorded anywhere, made a positive identification of Dale, describing even the presence of unusual bumps on the back of his neck, and related in graphic detail Dale's specific participation in the attack.[1]

---

1. She told of being accosted on the street and dragged through a schoolyard, up a flight of stairs to a platform where her clothes were literally ripped from her back, her wedding ring removed, and then made the subject of one criminal assault after another by each of five or six youths.

After being raped repeatedly she got to her feet and in her words: "One of them said, 'Man, this bitch is not unconscious,' and he hit me and knocked me down and then they carried me around to the other side of the platform."

Q. At the second locale, what happened?

A. I was in another part of the patio, and that is when he (indicating defendant) took his turn.

Q. This defendant, Arthur Dale?

A. Yes.

Q. Go ahead.

A. In taking his turn, they thought they had knocked me completely out. As he was taking his turn, he whispered in my ear and he said, "Come on, if you act right, I will not let them beat you any more, move a little bit."

Just then, the other boys wanted to know what he was saying, and they asked him if I was conscious or unconscious. They said, "Is she drunk? We cannot smell anything."

Then, one of them said, "I want to kiss the broad, I want to get my nuts off." I think he was the one behind me, and he was trying to make this boy let him put his penis in my mouth while this boy was intercoursing me.

Q. You mean this defendant?

A. Yes, and this boy said to the other one, "No, Man, don't do that, I want to kiss this broad, she got sweet lips, don't put your thing in her mouth, get out of the way."

Because he would not let him do that, he kicked me in the side of the face.

At that time, this boy whispered in my ear, "If you act right and do what I tell you, I will not let them beat you any more, just move easy. After this is all over, I will come to your house. Tell me where you live. Whisper to me."

BY MR. SPRAGUE:

Q. In other words, more people were joining in while the original people were still there?

A. Yes.

Q. When you say they stood you up, what do you mean?

A. They turned me upside down with my head against the wall. They had both my legs stretched out holding me, while they tried to use me. Then, they laid me down on the floor and turned me over and pulled my legs apart, and then they turned me back over and held my legs out and went at me from that angle, and then they turned me over again on my back.

When they could not get to me that way, they stood me up again and they pulled my legs apart and then one of them said "Lay her down again."

They laid me down again on the floor, and then he said "Hold her while I get in."

Two of them were holding me by the legs and the other one was trying to get to me.

They wanted me to move, but I couldn't move, because the glass on the floor was sticking into me, so, they started turning me and they said, "If this bitch don't move, I will stick my knife in her."

And, another one said, "I will blow her brains out, I have my gun."

Then, they started to strike the matches and burn me.

Q. What were you burned with?

A. Lit matches.

Q. Where did they burn you?

A. All up my side, with the lit matches. Somebody stuck cigarettes into me.

Q. Lighted cigarettes?

A. Yes, but I don't know who it was.

He laid his head real close to mine and he said, "Whisper, and put your arms around be."

He took my arms and he put them around his neck and that is when the others came and wanted to know if I had gained consciousness, and he told them no.

He put my arms around his neck, and I felt some bumps on the back of his neck, and I felt like a scar on his head.

Then, one of them said, "Man, what is taking you so long? Hurry up, I got to get mine. You know I just got out, I been away for three months, let me get in and finish."

When this boy finished, the other one got on, and this is how I knew this defendant was there, by the things that he was saying and by the feel of his head.

It then began to rain, and still others continued to rape her. Then, carrying her naked, holding her by her arms and legs, they carried her to a car and transported her to a vacant house: "In this house, I was laid on the floor, where there were a lot of broken glass and other things all over the floor, and that is where they started again."

Q. I am asking you, when you got to the vacant house, did you see this defendant there?

A. I could tell him by his voice, I knew that he was still there among them. They continued the mass rape:

Then the first one started all over again for this third time. In the meantime, they continued to make me hold their penis. After a while I started to swell and they could not get to me, and they started standing me up against the wall on my feet.

BY THE COURT:

Q. This was all after the defendant had left?

Indeed, the inculpatory testimony of the victim was much more devastating and clinical than that of Charles. Charles testified that he and Dale were drinking wine before the incident, that Dale had consumed about a half quart of wine, that three others had accosted the victim before he and Dale first saw her, that he was the third to rape her and that Dale was the fourth, that Dale and he were not in the car which transported the victim to the vacant house, and when asked if Dale had assaulted her again at the vacant house, she replied, "I don't think so."

Moreover, the defense itself introduced a third witness, Officer McGeehan, who corroborated the victim's testimony stating: "There were only indications of bumps" in the back of Dale's neck. In his direct testimony Dale, himself, described the presence of bumps on the back of his neck.

■ Clearly, the importance of Charles' testimony, although corroborative, did not rise to the quality of absolute essentiality to conviction that was present in *Giglio* and *Napue*. To vitiate the finding of guilt under the *Giglio-*

*Napue* rule, it must be demonstrated that the testimony had the force of a "reasonable *likelihood*" to affect the judgment of the fact finder. A comparison is invited to the standard utilized in determining harmless error where the necessary demonstration is simply a "reasonable *possibility* that the evidence complained of *might* have *contributed* to the conviction." Fahy v. Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963); Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). (Emphasis supplied.) [2] Thus, the defendant here must prove likelihood, rather than mere possibility.

In this context, we are particularly aware that the fact finder was an experienced criminal court judge then in his fourteenth year as a Philadelphia jurist. Although there is no indication that Judge Reimel even knew of the statement made by Judge Alexander, he was aware that Charles had pleaded guilty and was awaiting sentence. The reasons underlying guilty pleas are as familiar to trial judges as is the high incidence of such pleas themselves,[3] especially in state metropolitan courts. Indeed, the notion that guilty pleas are

---

MR. SPRAGUE:
A. No.
BY THE COURT:
Q. Was this another group that moved in on you?
A. No, it was the same group. One would go and take a walk and bring another party back.
Q. Now, these attacks just continued and continued, and what time was it when they finally finished?
A. During the time when they were burning me with the cigarettes and the matches, they were burning me then to see if I was conscious or if I was moving.

\*   \*   \*   \*   \*

Q. I asked you again to look at this de-defendant, Arthur Dale, do you have any doubt in your mind that he was one of the group that participated in this rape on you?
A. No, I do not have any doubt whatsoever.

2. In Schneble v. Florida, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972), Mr. Justice Rehnquist, writing

for the Court, expressed the harmless error standard as follows: "[U]nless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required."

3. Guilty pleas are prevalent in the state courts, and in the federal courts pleas of *nolo contendere* and guilty pleas represent an average of 79 per cent of the dispositions of all criminal defendants for the fiscal years 1956 through 1963. The commonplace practice of "plea bargaining"—compromises by prosecuting attorneys with criminal defendants or their counsel to obtain guilty pleas—is in part responsible for the high incidence of such pleas. There is a broad range of plea arrangements currently used by prosecutors. The most common are the sentence recommendations, the plea to a lesser included offense, and the dismissal of charges in an indictment, information, or other charging paper.
Note, "Guilty Plea Bargaining: Compromises by Prosecutors to Secure Guilty Pleas," 112 U.Pa.L.Rev. 865–868 (1964).

tendered in the anticipation of leniency or favor and that such pleas may be accepted in return for cooperation with the prosecution has even been codified. See ABA Standards Relating to Pleas of Guilty, 1.8(a):

> It is proper for the court to grant charge and sentence concessions to defendants who enter a plea of guilty or nolo contendere when the interest of the public in the effective administration of criminal justice would thereby be served. Among the considerations which are appropriate in determining this question are:
>
> \*   \*   \*   \*   \*   \*
>
> (v.) that the defendant has given or offered cooperation when such cooperation has resulted or may result in the successful prosecution of other offenders engaged in equally serious or more serious criminal conduct.

Judge Reimel knew that a participant in this gruesome affray was testifying for the Commonwealth in the case before him, and that this witness had pleaded guilty before another judge and was awaiting sentence. We find inescapable the conclusion that Judge Reimel must have assumed that witness Charles was expecting some concession or reward in his own case in return for his testimony against appellant. In any event, we are utterly persuaded that express knowledge of Judge Alexander's colloquy with the witness could not "in any reasonable likelihood" have affected the judgment of Judge Reimel, sitting as fact finder.

We conclude that Charles' testimony was merely corroborative, and not essential to the government's case. Moreover, we find no cogency in the speculation that the trial court's judgment was likely to have been affected by Judge Alexander's comments. Thus, even assuming that Charles' monosyllabic "no" constituted a false statement, we hold that the rule of *Giglio-Napue* is not applicable to this case.

The order of the district court, 327 F. Supp. 381, granting the writ of habeas corpus will be reversed.