STATE of Missouri, Respondent,

v.

Daniel Lee ALLEN, Appellant.

No. KCD 27343.

Missouri Court of Appeals,
Kansas City District.

Nov. 3, 1975.

Motion for Rehearing and/or Transfer
Denied Dec. 8, 1975.

Willard B. Bunch, Public Defender, Sixteenth Judicial Circuit, Philip H. Schwarz, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Jefferson City, for respondent.

Before WASSERSTROM, P. J., and SHANGLER and DIXON, JJ.

SHANGLER, Judge.

The defendant was convicted by the court of the second degree murder of Robert Dennis, an infant of 18 months, and was sentenced to a term of imprisonment for 15 years.

At the time of the fatality and before, the defendant had been living with Shirley Dennis and her two children, Carol and Robert. The defendant attended them while she worked the graveyard shift at a local factory. Ms. Dennis was at work in the early morning of February 1, 1973, when the defendant appeared at the Richards-Gebaur Air Force Base Emergency Room with the boy Robert. The receiving physician, Dr. Joel Grossman, found the boy in severe distress with distended abdomen, bruised and contused about the head and face, and burned about the groin and left leg. In this condition, the boy was on the verge of death and was rushed by ambulance to Mercy Hospital, where he died later in the day. After he had delivered the boy to the emergency room at the Air Force Base, the defendant notified Ms. Dennis at her place of employment that the child had been taken to Mercy Hospital and accompanied her there.

At the trial, Dr. Grossman testified that the defendant had told him that the burns on the child had been caused by an electric hair dryer and the bruises from a fall the child had taken down a flight of stairs several days earlier. The doctor considered that the injuries, except for the burns, were consistent with trauma, such as a fall down the stairs, but could not definitely say the nature of the trauma. The bruises had been inflicted at different times; some, perhaps two or three days earlier.

The pathologist, who performed the autopsy, Dr. Fritzlen, described the bruises on the body of the boy and gave his opinion that death resulted from "a severe blunt type force injury to the upper abdomen". The injury he observed was not caused by falling on the stomach, but from the force of "a rounded object of not particularly large size", perhaps a human fist, and added that the injuries he found fit the battered child pattern. Dr. Fritzlen estimated that the injury was at least 18 hours old, but not older than 48 hours.

Ms. Dennis had been living with the defendant for about two months. They separated the month preceding the fatality when she discovered he had inflicted bruises on Robert, but they rejoined within days upon his promise that he would not hurt the children again. On the day before the fatality, Ms. Dennis had been home with the children until late evening, until time for work. The boy Robert then appeared in good health except for a slight fever and some old bruises on the stomach, which the defendant led her to believe had been the result of a fall.

The prosecution presented Ms. Chancellor, as a witness, a friend of Ms. Dennis. She had occasion to meet the defendant at the Air Force Base NCO Club in January of 1973 and inquired after Ms. Dennis. The defendant told her she was at home with the children, but that he had to get away for a couple of drinks because "they were driving him up the wall". During the course of conversation, he told her he had spanked Robert because he would just lie around and bawl without reason.

In evidence, also, was the confession of the defendant taken by the police on the night of February 1, 1973. The statement contained unequivocal admissions that 1) the burns Robert suffered resulted when defendant placed the hair dryer in his diaper; 2) that night he had struck Robert across the cheek with a rubber spatula, and 3) he had struck Robert in the stomach with his fist three or four days before.

The defendant took the stand on his own behalf. At the time of the event for which he stands accused, he was attending college. He struck a liaison with Ms. Dennis, who, with her two children, soon moved into his quarters, with the result that he became babysitter while she worked. He admitted he had occasionally struck Robert to discourage mischievousness, and that on the afternoon before his death, he had struck the boy in the face with a spatula, but not with either the intent or the force to injure. After his return from delivering Ms. Dennis to her place of work that night, he found the children awake. Robert wanted to play with the hair dryer and to feel the air blowing on him, so the defendant inserted the device in his diaper as a means of keeping the dryer away from the sister, Carol, who was attempting to wrest it from the boy. The defendant went into the bedroom momentarily and when he returned saw the boy lying on the floor. He noticed a burn on the groin area, became alarmed, and rushed the child to the Air Force Base Hospital. The defendant acknowledged that he had told the police he had struck Robert with his fist, but contended that this admission was induced and that he actually never did.

The defendant offered evidence by other witnesses that Ms. Dennis was a slatternly, harsh and punitive parent.

The testimony of Ms. Dennis disclosed that she also had been charged with the death of Robert, but that the charge was dismissed after she testified against the defendant at the preliminary hearing. In response to the inquiry at the trial by the prosecutor:

"Now, were any promises or anything made to you, or any discussion with you, in connection with the dismissal of charges against you?"

the witness replied:

"No, sir".

In response to the cross-examination:

"Didn't your attorney come and tell you, 'They are going to dismiss charges against you in return for testimony?'"

she answered:

"No, I didn't know anything about it until after they had already dismissed the charges."

The witness then attributed these damaging statements to the defendant, made to her during the course of the proceedings:

1. On the morning of February 1, 1973, when the defendant came to her place of employment to tell her the child had been taken to the hospital, he suggested "there would be less trouble if we just told the police that Robbie fell down the steps". At that time, also, he admitted to her that he had struck the child across the face with a spatula.

2. Later, at the police station, the defendant told her that he had given the electric dryer to the infant for a plaything, but did not mean to harm him. Then, while still at the station, he had told her he was sorry he hurt Robert, but did not mean to hurt him that badly.

3. Finally, after the charges were filed and Ms. Dennis was released from accusation, the defendant called her to say "he was sorry that he did it, that he still cared about me, he didn't mean to hurt Robbie, and he was sorry".

The new trial motion of the defendant contended that the prosecutor misled the court by failing to correct the testimony of Ms. Dennis that she had been given no promise in return for her testimony in the prosecution against the defendant.

At the hearing on the motion, Mr. Peebles, attorney for Ms. Dennis, acknowledged that he had entered into an understanding with Forge [the prosecutor in charge at that stage of the proceedings] that the charge of murder against Ms. Dennis would be dismissed if she testified on behalf of the State in the prosecution for the same offense against the defendant. Accordingly, Peebles instructed Ms. Dennis to testify at the preliminary hearing, and the charge against her was subsequently dismissed. Peebles did not recall informing Ms. Dennis about the agreement with Forge and did not inform her of the dismissal until it was actually entered.

Forge testified that he had informed Peebles that he would recommend dismissal of the charge against Ms. Dennis in return for her testimony. Ms. Dennis, he said, was not present at these discussions and he was not sure if she was aware of the arrangement.

Ms. Dennis testified that she was neither aware of any agreement to dismiss the charge against her for her testimony nor even of the dismissal itself until after it had been entered. The only advice given by her attorney was to tell the truth.

Finally, trial prosecutor Williamson testified that he was not aware of any agreement between Peebles and Forge for the dismissal of the Dennis prosecution. His dismissal of the Dennis charge in the circuit court was prompted by a lack of evidence.

The trial court concluded that, indeed, the prosecution and the Dennis defense had arranged for a dismissal of the charge against her for her testimony against the defendant, but that Ms. Dennis was not aware of the arrangement. The denial of the motion for new trial rested upon the paramount consideration that the basis for the conviction was the testimony given by the defendant himself and his statement to the police. The court found the testimony of Ms. Dennis, in any event, was not critical to the conviction.

On this appeal, the defendant contends that the State owed a duty to correct the testimony of Shirley Dennis—allegedly false—that her evidence was not induced by promises of leniency, and that this lapse by the State affected the determination by the trial court of the credibility of the witness and thus deprived the defendant of a fair trial.

■ It has been declared by the United States Supreme Court as a matter of constitutional principle that when the reliability of a witness may determine guilt or innocence, the failure of the prosecution to correct false evidence which affects the credibility of the witness is a denial of due process. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *State v. McClain*, 498 S.W.2d 798 (Mo. banc 1973). That the silence of the prosecutor was without guile or intent to prejudice does not diminish the force of the rule; if there is reasonable likelihood that the false testimony could have affected the judgment of the trier of fact, a new trial is required. *Giglio, supra*, 405 U.S. l. c. 153, 92 S.Ct. 763, *Napue, supra*, 360 U.S. l.c. 271, 79 S.Ct. 1173, *McClain, supra*, 498 S.W.2d l. c. 800.

■ The defendant here waived trial by jury, thus it befell the court to assess credibility, believe the facts and determine guilt or innocence. Whether the testimony of Ms. Dennis against the defendant was in consideration of a promised leniency or given without any such expectation bore on

the credibility to be accorded the witness by the trier of fact. At the trial, in response to a direct question by the prosecutor, the witness Dennis denied she had been promised dismissal of charges for her testimony. In fact, a prosecutor at an earlier phase of the proceedings had not only concluded such an agreement with counsel for Dennis, but had also given it effect by the discontinuance of the murder charge after she had testified for the State at the preliminary hearing of the defendant. The failure of the prosecution to correct the testimony of the witness amounted to suppression of material evidence on credibility, notwithstanding the trial prosecutor was not aware of the agreement between his predecessor and the Dennis counsel, nor that the denial by the witness of knowledge of such an arrangement was not directly impeached.

■ The office of prosecutor is integral and binds the sovereign in criminal proceedings no matter through which agent it speaks. A promise to the defense made by one prosecutor is imputable to the State and controls the other prosecutors. *Giglio v. United States, supra,* 405 U.S. 1. c. 154[4], 92 S.Ct. 763; *State v. Koonce,* 504 S.W.2d 227, 230[2] (Mo.App.1973). And evidence that a prosecutor has agreed with counsel for an accused for leniency in exchange for testimony against another defendant, which he then gives, imports the prior concurrence of the accused. If the testimony of the client denies knowledge of the promise of leniency, the prosecutor owes disclosure of the agreement, the issue becomes one of credibility, and falls within the pale of *Giglio, Napue* and *McClain.* See, also, *State v. Brooks,* 513 S.W.2d 168, 175[14] (Mo.App. 1973).

The question remains whether the defendant was denied a fair trial. Otherwise stated, did Ms. Dennis give false evidence and, if so, was there a reasonable likelihood that it affected the judgment of the trier of

fact? *Giglio, Napue, McClain* and cases of that ilk have ordered new trials where the suspect testimony was decisive—and not merely corroborative—on the issue of guilt and where that material evidence of credibility was withheld from the trier of fact. In this case, the defendant waived trial by jury and submitted his cause to the court for determination of the facts and rendition of judgment. On the motion for new trial, disclosure of the agreement for leniency between prosecutor and counsel was made to the court and the knowledge of witness Dennis probed. The court found expressly that Ms. Dennis had no knowledge of the arrangement between her counsel and the prosecutor, and that the witness had not given false testimony. The court concluded that in all but one respect, the testimony of Ms. Dennis was merely corroborative of the testimony and confession given by the defendant, himself, so that Ms. Dennis was not critical to the judgment of conviction entered.

■ Our review concurs with the finding of the trial court that the testimony of Ms. Dennis was not essential to the conviction, nor, in reasonable likelihood, affected the judgment of the court as finder of fact.[1] The testimony of the witness Dennis that the defendant admitted he had struck the child across the face with a spatula, that he had given the electric hair dryer to the infant as a plaything, that he had hurt the child, were all matters otherwise confessed by the defendant. What remains of her testimony is the suggestion of the defendant that "there would be less trouble if we just told the police Robbie fell down the steps." Although aspersive of innocence, that imputation is drastically offset by the corroborated admissions and by the confession of the defendant—most damaging of all—that he had struck the child in the stomach with his fist. The judgment of conviction was the result of a fair trial.

1. See, *United States ex rel. Dale v. Williams,* 459 F.2d 763 (3rd Cir. 1972), for the application of these principles in a court tried case.

**420**

The defendant also urges that the trial evidence was insufficient for a conviction of second degree murder. The elements of that offense are a willful, premeditated killing of a human being with malice aforethought. *State v. Anderson,* 375 S.W.2d 116, 119[2, 3] (Mo.1964). The intent to kill is an essential element of murder second degree [*State v. Chamineak,* 343 S.W.2d 153, 161[13–15] (Mo.1961) and the malice is the intentional commission of the wrongful act without just cause or excuse. *State v. Williams,* 323 S.W.2d 811, 813[5–8] (Mo.1959). The sense of the contention made by defendant is that there was no evidence of an intent to kill.

The evidence of the pathologist who performed the autopsy was that death resulted from a blunt force to the upper abdomen, such as a blow by a rounded fist, struck with such severity as to rupture the pancreas and to bruise near structures.

The State concedes that the first is not usually considered a deadly weapon, but under these circumstances, the assault by the defendant with his fist manifests an intent to kill. The rule is stated generally [40 C.J.S. Homicide, § 25 p. 876]

A blow with the fist does not ordinarily imply malice although there may be an inference of malice where such an attack has been made on an infant of tender years or on a person enfeebled by old age or worn out by disease.

And [40 Am.Jur.2d, Homicide, § 268, p. 532]

An intent to kill may, under the circumstances of the particular case, be inferred from an assault with the hands where there is great disparity in physical strength and ability as between assailant and victim . . .

Our decisions are in accord. The conviction of the second degree murder of a six year old child was sustained in *State v. Lamborn,* 452 S.W.2d 216 (Mo.1970) where the death blows were administered by the hands of the defendant [l. c. 218[1–4]]

It was as much murder for defendant to kill deceased in the manner described in evidence as if she had shot [the child] with a pistol or stabbed her with a knife . . . Murder may be committed with the hand or fist.

The intent to kill may be inferred from the circumstances. There was sufficient evidence to prove that the defendant struck the child in the abdomen with such force as to cause his death. The testimony of the defendant that he struck the boy in the stomach with his fist and the evidence of the pathologist that the blow was the cause of death support this thesis. Where in an assault one uses a weapon likely to produce death, and death ensues, the actor is presumed to have intended the death. *State v. Hammonds,* 459 S.W.2d 365, 368[1–4] (Mo.1970).

The judgment is affirmed.

All concur.