**STATE of Missouri, Respondent,**

v.

**Jack C. ROSE, Appellant.**

**No. KCD 27824.**

Missouri Court of Appeals, Kansas City District.

March 1, 1976.

Motion for Rehearing and/or Transfer Denied March 29, 1976.

**116**

Thomas M. Larson, Public Defender, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Douglas G. Mooney, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and SWOFFORD and SOMERVILLE, JJ.

SWOFFORD, Judge.

Appellant (hereafter defendant) was charged with Robbery First Degree and after a jury-waived trial was found guilty and sentenced to a term of seven years in the Missouri Department of Corrections. He asserts three points of error on this appeal, which may be summarized as (1) his motion for a directed judgment of acquittal at the close of all the evidence was improperly overruled; (2) his motion to suppress identification evidence was improperly overruled; and (3) the trial court erred in quashing a subpoena duces tecum whereby he sought to obtain certain records of the police department. An examination of the record and of defendant's brief reveals that his first and second points, in fact, deal with basically the same problem, that is, his claim that the identification evidence was so insubstantial and conflicting that a verdict of acquittal should have been entered. These points will therefore be considered together.

In viewing the record in an appeal such as this, the scope of appellate review is defined and limited by certain well-recognized principles.

■ Since this case was submitted to the court without a jury, the provisions of Rule 26.01(b), Rules of Criminal Procedure, are applicable and, thus, the court's decision of guilty "shall have the force and effect of the verdict of a jury". The scope of appellate review is not to weigh the evidence, but rather, to conclude whether or not the court's decision is supported by substantial evidence. If so, such finding and decision should be affirmed. *State v. Daniels,* 487 S.W.2d 465, 469[4] (Mo.1972); *State v. Lane,* 475 S.W.2d 91, 94[1] (Mo.1971). It is the basic function of the trial court in such a case to judge the credibility of the witnesses and to resolve any conflicts or inconsistencies in their testimony. *State v. Styles,* 476 S.W.2d 591, 592[3] (Mo.1972); *State v. Landess,* 485 S.W.2d 140, 142[5] (Mo.App.1972).

■ In determining the sufficiency of the evidence, this court accepts all evidence tending to support the conviction together

with all favorable inferences reasonably to be drawn therefrom. *State v. Harris,* 485 S.W.2d 612, 613–614[2] (Mo.1972); *State v. Petrechko,* 486 S.W.2d 217, 218[1] (Mo. 1972); *State v. Lemon,* 504 S.W.2d 676, 679[1] (Mo.App.1973). Further, all inferences which could be drawn contrary to the result reached by the finder of the facts must be disregarded. *State v. Stapleton,* 518 S.W.2d 292, 296[1] (Mo. banc 1975).

Bearing in mind that the only real issue raised by defendant's first and second points is whether there was substantial evidence, untainted by pretrial identification procedures, as to the identification of the defendant to support his conviction, a summary of the evidence is necessary.

At about 9:00 o'clock a. m. on Sunday, June 23, 1974, a lone male entered King's Food Host restaurant at 1418 E. 63rd Street in Kansas City, Missouri and approached the cash register stand. As he arrived at the stand, an employee, Elisa Mitchell, and the manager, David Stringberg, were standing side by side at that position. When the man was about two or three feet away from her, Mitchell inquired if she could help him. This man thereupon drew a handgun, pointed it at Mitchell and Stringberg, announced a holdup, and told Mitchell to give him the money in the cash register and ordered Stringberg to lie down on the floor.

There was only one customer in the restaurant, a Joseph Downing, who was seated in a booth which was apparently about 20 to 25 feet from the cashier's stand. The robber shouted at him to lie down on the floor, and when he failed to promptly comply, the robber fired a shot from the gun into the wall above and in the vicinity of Downing's position. This resulted in prompt compliance with the order.

The robber then again ordered Stringberg to lie on the floor, and he complied. Mitchell handed the robber the bills in the cash register and he left the premises. Both Mitchell and Stringberg testified that they had a clear view of the robber's unmasked face and Downing said he had "a reasonably good look" at the robber.

Mitchell described the robber as a black, slender, young man, about 19 years of age, about 5 feet 10 inches tall, with a light or light to medium, or light to fair, complexion, wearing a hat, no face mask, a gray shirt and Burgundy trousers, with a natural "hair-do", no facial hair or noticeable sideburns.

The police summoned to the scene of the robbery showed both Mitchell and Stringberg a number of police photographs carried in the police car. Neither could make any identification from these. On Tuesday, June 25, 1974, Mitchell and Stringberg were requested to come to police headquarters and were shown from 150 to 200 police photographs. From this group, Stringberg picked out two pictures (which it was later developed were both pictures of the defendant taken at different times) which he tentatively identified as the robber. Mitchell picked one of the same photographs which she thought was "very, very similar". It appears from the testimony of Detective Keith Clavin of the Homicide and Robbery Unit of the police department that the defendant had been picked up by the police in connection with another matter while Mitchell and Stringberg were looking at the photographs on June 25, 1974, and a lineup was set up, which they were asked to view. At the lineup, again Mitchell could not make any positive identification but stated defendant "looked very similar". Stringberg did positively identify the defendant from the six-man lineup as the person that robbed King's Food Host on June 23, 1974, and the defendant was charged.

At the trial of the case, both Micthell and Stringberg testified for the state. Again, Mitchell could make no positive identification of the defendant, but Stringberg did positively identify him as the robber, based upon his independent view of him at the time of the robbery. The record is devoid of any evidence of suggestive influence upon Stringberg by the police or anyone else in the pretrial identification proceedings of such a character as to give rise to a very substantial likelihood of irreparable

misidentification. His identification testimony was within the formula of the controlling authorities so as to present the factual issue of identity. *State v. Boothe,* 485 S.W.2d 11, 13[2] (Mo. banc 1972); *State v. Murphy,* 508 S.W.2d 269, 274[1] (Mo.App. 1974); *State v. Jones,* 531 S.W.2d 67, 70[1] (Mo.App.1975); *State v. Lee,* 491 S.W.2d 317, 322–323[8] (Mo. banc 1973).

However, the defendant asserts that such testimony by Stringberg was directly in conflict with the description of the robber given by Mitchell. This position was based upon the fact that she had described the man as of a "light complexion" or "fair", and the defendant asserted at trial, and reiterates here, that such description does not fit or properly characterize the shade of defendant's skin. This position calls into play a nebulous comparison of degree of color and the broad descriptive words used by Mitchell. The trial court, with the benefit of personal observation of defendant, specifically found that the identification by Stringberg was consistent with the description by Mitchell.

The defendant testified in his own behalf and stated that at the time of the robbery, he was at his father's home asleep in his bed. His father corroborated this alibi.

The defendant also offered the testimony of Joseph Downing. It was developed that Downing was 66 years old; that he wore bifocal glasses for astigmatism, and that his eyes had not been examined for about ten years. He was a retired psychologist. He described the robber as a young, light-complexioned, black man, of average height. There was no evidence that he had ever been shown any police photographs and he had not attended any lineup. He was called as a defense witness and testified that from viewing the defendant in court and listening to his voice, "I would be inclined to say it (sic) is not the man that I saw there"; that " * * * I don't think I am looking at the man who was in that restaurant that morning"; and that he was "relatively certain" of this.

▮ Upon the factual issues of identification and alibi, thus raised, the trial court, as

trier of the facts, decided them adversely to the defendant. Its decision was supported by substantial evidence, and the defendant's first and second points are ruled against him.

Although this court has not been favored with an exact copy of the document, either as part of the record or filed separately, it appears that the defendant caused a subpoena duces tecum to be issued directed to Detective Keith Clavin, directing him to produce the 150–200 police photographs shown to Mitchell and Stringberg on June 25, 1974, and other documents pertaining to the pretrial identification procedures of the police department. Defense counsel stated that he had left this subpoena with Clavin's department head the evening before the trial, and that it had not been personally served upon Clavin. Clavin stated that he had not been served with the subpoena but had found it lying on a clipboard at headquarters the night before the trial; that he did not have control or possession of the documents sought and that he had done nothing about the subpoena.

The state made an oral motion to quash the subpoena, which the trial court sustained, after developing the above facts and the further fact that the subpoena contained no return of service. The court's order in this regard is urged as error under defendant's third point.

It should be noted that the trial court did not base this ruling on the propriety of the form of the subpoena nor on the relevancy of the documents sought to be produced, but solely upon the fact that there was no showing of compliance with Rule 25, Rules of Criminal Procedure, and Section 491.120 RSMo 1969.

Rule 25.20 provides:

"Service and return of service of subpoenas in criminal cases shall be made in the same manner as provided by law in civil suits. * * * "

Section 491.120 RSMo 1969, provides, in part:

"Subpoenas, how served and returned

1. The service of a subpoena to testify shall be by reading the same or delivering a copy thereof to the person to be summoned; * * *.
2. The return shall show the manner of service * * * and, if served by an officer, his return shall be conclusive of the facts therein stated; if served by a private person, the return shall be verified by affidavit * * *."

The trial court correctly ruled that there was a complete absence of any compliance with the procedural mandates of the statute with reference to the service or return thereto of the subpoena duces tecum here considered. The motion to quash was properly sustained. It should also be noted that thereupon, the defendant made no request to the court for an opportunity to properly serve his subpoena and make return thereto, although it appears that Detective Clavin was still in court on the witness stand when the ruling was made. The defendant's third point is ruled against him.

The judgment is affirmed.

All concur.