STATE of Missouri,
Plaintiff-Respondent,

v.

Robert Joseph COOK,
Defendant-Appellant.

No. 10339.

Missouri Court of Appeals,
Springfield District.

Oct. 21, 1977.

■■■■■■■■■■■■■■■■■■■■

John D. Ashcroft, Atty. Gen., Robert M. Sommers, Frank J. Murphy, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

Scott B. Tinsley, Anderson & Tinsley, Springfield, for defendant-appellant.

Before TITUS, P. J., and PARRISH, CASTEEL and HENRY, Special Judges.

HERBERT C. CASTEEL, Special Judge.

Appellant (hereafter defendant) was charged with the second degree murder of William Anthony Sater, an infant of 18 months, and after a jury-waived trial was found guilty and sentenced to a term of 25 years in the Missouri Department of Corrections. On this appeal he asserts 5 points of error which may be summarized as follows: (1) that the evidence was insufficient to support the conviction because of the lack of any evidence of premeditation and intent to kill; (2) that defendant's verbal and written statements were erroneously admitted because they were given in an environment of psychological coercion; (3) that the testimony of two medical experts was erroneously admitted because they had no previous experience with the type injury received by decedent; (4) that defendant's verbal and written statements were erroneously admitted because no corpus delicti was established; and (5) that the testimony of one medical expert as to the time of the injury and as to possible injury from a previous blow was erroneously admitted because it was based on hearsay.

In *State v. Rose*, 535 S.W.2d 115, 116–117[1–3 and 4] (Mo.App.1976), the guidelines for appellate review of a court-tried criminal case are set forth as follows:

> "Since this case was submitted to the court without a jury, the provisions of Rule 26.01(b), Rules of Criminal Procedure, are applicable and, thus, the court's decision of guilty 'shall have the force

and effect of the verdict of a jury'. The scope of appellate review is not to weigh the evidence, but rather, to conclude whether or not the court's decision is supported by substantial evidence. If so, such finding and decision should be affirmed. *State v. Daniels*, 487 S.W.2d 465, 469[4] (Mo.1972); *State v. Lane*, 475 S.W.2d 91, 94[1] (Mo.1971). It is the basic function of the trial court in such a case to judge the credibility of the witnesses and to resolve any conflicts or inconsistencies in their testimony. *State v. Styles*, 476 S.W.2d 591, 592[3] (Mo.1972); *State v. Landess*, 485 S.W.2d 140, 142[5] (Mo.App. 1972).

> "In determining the sufficiency of the evidence, this court accepts all evidence tending to support the conviction together with all favorable inferences reasonably to be drawn therefrom. *State v. Harris*, 485 S.W.2d 612, 613–614[2] (Mo. 1972); *State v. Petrechko*, 486 S.W.2d 217, 218[1] (Mo.1972); *State v. Lemon*, 504 S.W.2d 676, 679[1] (Mo.App.1973). Further, all inferences which could be drawn contrary to the result reached by the finder of the facts must be disregarded. *State v. Stapleton*, 518 S.W.2d 292, 296[1] (Mo. banc 1975)."

■■■ With these principles in mind, we consider defendant's first point—that the evidence was insufficient to support the conviction. The necessary elements of second degree murder are willfulness, premeditation, and malice aforethought. *State v. Randolph*, 496 S.W.2d 257, 260[1] (Mo. banc 1973). In the context of murder, willfulness means " 'intentionally' " or " 'knowingly' "; premeditation means " 'thought of beforehand for any length of time, however short' "; and malice means " ' "the intentional doing of a wrongful act without just cause or excuse" ' ". *State v. Woodard*, 499 S.W.2d 553, 556 (Mo.App.1973). A brief statement of the facts will show that the trial court did hear substantial evidence supporting all necessary elements of the crime.

In late January of 1975, Sue Ann Sater, the mother of Tony, the infant victim, met the defendant and approximately two days later permitted him to move into her apartment. Defendant was 19 years old, 6 feet 2 inches tall, and weighed 285 pounds. He was unemployed but Sue was working as a nurse's aide. On February 7, 1975, Sue terminated the services of a babysitter she had been using for Tony because Tony had been coming home dirty and with scratches and "a few bruises on his arms and shin." After this, defendant took care of Tony most of the time that Sue was at work. After defendant started caring for Tony, Sue noticed more and larger bruises on the child's body. Tony was an active child and appeared to suffer more falls than average. However, one large bruise on the child's buttocks was in the shape of a hand and was much larger than the hand of either of two women who examined the child on February 13 and February 14.

On March 14, 1975, defendant and Sue moved from the apartment to a mobile home. Defendant's parents kept Tony during the move, and in the late afternoon defendant and Sue took Tony to the mobile home and, because he had missed his nap and was sleepy, Sue put him to bed with his clothes on. Later, while defendant and Sue were eating their supper, Tony got out of his bed and came to the table, and Sue then changed him to his pajamas for the night and put him back to bed. During this time defendant told Sue to get back to the table as her supper was getting cold, but she stayed with Tony until he was asleep. She testified that Tony appeared to be in good health.

The small bedroom occupied by Tony contained three pieces of furniture, a bed, a dresser, and a chest of drawers. The bed consisted of a twin-sized mattress and box springs with legs affixed into the bottom of the box spring. It was 19 inches from the floor to the top of the mattress. One side of the bed was against the south wall, and one end of the bed was against the west wall. The dresser was against the west wall with a distance of approximately 8 inches between the bed and the side of the dresser. The dresser was 2½ feet tall, and the corners on the top and front of the dresser were rounded. The chest of drawers was against the north wall several feet from the bed.

After supper defendant and Sue watched television; and about 9:00 o'clock, after checking on Tony, Sue went to bed. Defendant was also lying on the bed watching television and Sue was "half asleep" when they heard a "thump" from Tony's room and defendant got up to check on him. Sue was not sure whether she heard a second "thump" or not because she had dozed off again, but a few minutes after defendant left her room she heard Tony crying, and then defendant came in carrying Tony who was crying, holding his head to one side, and holding his clenched fist against his abdomen. After some discussion they took Tony to a hospital.

Dr. Robert L. Coscia, a surgeon with special training in trauma and shock, operated on Tony the following morning. He found several injuries in the abdominal area, the most significant being a "complete disruption" of the duodenum. This portion of the small intestine was torn completely in two, allowing the intestinal contents to escape into the abdominal cavity, causing a "sepsis" or infection, which resulted in Tony's death on the morning of March 16, 1975. An autopsy was performed later that day by Dr. Robert L. Lovett, a physician and pathologist. Both doctors testified that Tony's injuries were caused by an external force applied generally from front to rear and that a great deal of force was required. They stated the injuries were consistent with the child's being thrown with considerable force against the rounded corner of the dresser and were inconsistent with the usual childhood falls.

The defendant gave an oral statement to law officers on March 19 and then gave a written statement on March 25, 1975. On both occasions he was advised of his rights before he was questioned. The key portion of his written statement follows: "I heard something in Tony's room. I went into

Tony's room and he was playing in the floor. I sat him upon the bed and Tony jumped back down. It made me mad. I picked him up and told him to lay down and threw him bodily toward the bed and Tony didn't hit the bed, he hit the corner of the dresser which was flush against the wall and fell back onto the bed and Tony started crying."

There is little question as to the element of malice. The court could and did find that defendant threw the child with great force—" ' "the intentional doing of a wrongful act without just cause or excuse" ' ". *State v. Woodard, supra,* 499 S.W.2d at 556. This supplies the element of malice aforethought. There was substantial evidence from which the court could find that defendant became angry at the child and picked him up and threw him with great force and thus his wrongful act was " 'thought of beforehand for any length of time, however short' ". *Woodard.* This supplies the element of premeditation.

There remains the element of willfulness—did the defendant act " 'intentionally' " or " 'knowingly' "? *Woodard* at 556. An intent to kill or to cause serious bodily harm is an essential element of murder in the second degree. *State v. Hudson,* 521 S.W.2d 43, 46[6] (Mo.App.1975); see also MAI–CR 6.06. Defendant is held to have intended all the natural consequences of his acts. *State v. Lamborn,* 452 S.W.2d 216, 218[1–4] (Mo.1970). In that case, a conviction of second degree murder of a 6-year-old child was affirmed upon evidence showing that defendant, a woman, had previously mistreated the child and on the night of the child's death had beaten her head against a window and the bottom of the window.

■ The intent to kill may be inferred from the circumstances; and when an assault is by a means likely to produce death, and death ensues, the actor is presumed to have intended the death. *State v. Allen,* 530 S.W.2d 415, 420[9–11] (Mo.App.1975). In that case, a conviction of second degree murder of an 18-month-old infant was affirmed upon evidence that defendant, a

young man, had hit the child in the stomach with his fist some 3 or 4 days before its death, causing a rupture to the pancreas. Evidence of prior mistreatment of a child may be considered in establishing the intent required for murder in the second degree. *State v. Hudson, supra,* 521 S.W.2d at 45[4].

■ In the present case, there was substantial evidence from which the trial court could find the following relevant facts: that defendant had previously mistreated Tony, indicating animosity or jealousy; that on the night in question the defendant was irritated when Tony interrupted the evening meal; that he was further irritated by the later interruption, and became so angry when Tony jumped off the bed the second time that he picked him up and threw him with great force toward the bed. Ordinarily this would not be a means likely to produce death or serious bodily harm and thus would not be a means from which the necessary intent may be inferred. But different standards are applied where there is great disparity in physical strength and ability. *State v. Allen, supra,* 530 S.W.2d at 420. The assault in this case, by a 6 foot 2 inch, 285 pound man upon a 25 pound infant, involved such force that it was likely to produce death or serious bodily harm; and since death did result, the defendant is presumed to have intended the death. We find there was substantial evidence to support all of the necessary elements of second degree murder.

By his second point of error, defendant claims that his oral and written statements were involuntary and, therefore, should not have been admitted. He insists that he was frightened by "swear words" and threats of a first degree murder charge and misled by promises of leniency and misinformation as to the elements of second degree murder to the point of rendering his statement involuntary. The defendant testified in support of these claims and in addition repudiated the written statement claiming that it contained the officers' words and not his. Two officers testified that no threats or promises were used, that very few "swear words" were used and these were not used in an-

ger, and that the statement was typed word for word as defendant gave it. They agreed, however, that one officer did tell defendant that the difference between first and second degree murder was the element of intent.

■■■ We give due deference to the opportunity of the trial court to judge the credibility of witnesses; and where the testimony conflicts as to whether the confession was voluntary, admission of the confession into evidence by the trial court is a matter of discretion. *State v. Blankenship*, 526 S.W.2d 78, 82[6, 7] (Mo.App.1975). As to the misinformation pertaining to the elements of second degree murder, we agree with the trial court that this did not render the confession involuntary. Since this led defendant to believe that even an accidental killing amounted to second degree murder, it seemingly would have discouraged rather than encouraged a statement. We find no error in the admission of defendant's oral and written statements.

The third point attacks the qualifications of the two medical experts to testify as to the cause of death. Neither doctor had ever seen this precise injury before in a child less than two years of age. Dr. Coscia testified this was only the second such case in medical literature. However, Dr. Coscia testified that he had performed surgery on 13 to 15 patients who had traumatic injuries to the duodenum and that in a recent 18-month period he had performed approximately 75 operations involving injuries to the abdominal area. When Dr. Lovett took the stand, defendant admitted his qualifications as a pathologist.

■■■ Qualification of an expert witness in a criminal case is a matter resting primarily in the sound discretion of the trial court and is not reversible on appeal absent a clear showing of abuse of that discretion. *State v. Harvell*, 527 S.W.2d 445, 447[1] (Mo.App.1975). Clearly there was no abuse of the trial court's discretion in this case. We find no merit in defendant's third point of error.

Point four claims that defendant's oral and written statements were inadmissible because no corpus delicti was established in that there was no evidence of a criminal agency causing the death of the child. This point rests on point three—defendant claiming the testimony of the medical experts as to cause of death should have been excluded and therefore the corpus delicti was not established. We have ruled point three against defendant, and it follows that he must fail on this point, too.

By his final point, defendant claims error in the admission of Dr. Coscia's testimony as to the time of the injury and as to the possibility of two separate injuries to the duodenum because this was based on a tissue report made by Dr. Lovett but not testified to by Dr. Lovett. Defendant relies on *State v. Johnson*, 504 S.W.2d 334 (Mo.App.1973), where it was prejudicial error to permit the coroner to testify from the autopsy report of a doctor who did not appear at the trial.

■■■ In the present case, Dr. Lovett was called as a witness. Furthermore, the statement by Dr. Coscia to which defendant objects was found in the second redirect examination. Prior to this, he had testified that he saw no evidence of two injuries, that in his opinion the injuries were not more than 24 hours old, and that defendant's theory of two injuries to the child's duodenum was "unlikely." Only after continued probing by the attorneys, did Dr. Coscia volunteer the information that his findings were supported by the tissue report. When Dr. Lovett took the stand, he stated the two injury theory was "impossible." Thus, Dr. Coscia's hearsay reference to Dr. Lovett's report was cumulative and harmless. *State v. Coker*, 534 S.W.2d 80 (Mo.App.1976). We rule point five against defendant.

The judgment is affirmed.

TITUS, P. J., and JOHN E. PARRISH and GEORGE HENRY, Special Judges, concur.