**June Charles SIMS, Petitioner,**

v.

**Donald WYRICK, Warden, Respondent.**

**No. 80–1126–CV–W–1.**

United States District Court,
W.D. Missouri, W.D.

Dec. 9, 1982.

Raymond C. Conrad, Jr., Federal Public Defender, Kansas City, Mo., for petitioner.

John Ashcroft, Atty. Gen., State of Mo., Kelly Klopfenstein, Asst. Atty. Gen., Jefferson City, Mo., for respondent.

## MEMORANDUM AND ORDERS ᛫ SUSTAINING PETITIONER'S OBJECTIONS TO MAGISTRATE'S PROPOSED FINDINGS AND RECOMMENDATION AND GRANTING APPROPRIATE HABEAS RELIEF

### I.

JOHN W. OLIVER, Senior District Judge.

On December 22, 1981, for reasons stated in detail, this Court concluded that petitioner had exhausted all four federal claims alleged in his *pro se* petition for federal habeas corpus and entered an order pursuant to 28 U.S.C. § 636(b)(1)(B) directing that Chief Magistrate Calvin K. Hamilton conduct an appropriate evidentiary hearing and thereafter submit to this Court proposed findings of fact and recommendations for the disposition of this case. The Federal Public Defender was appointed to represent the *pro se* petitioner.

Chief Magistrate Hamilton conducted an evidentiary hearing on March 22, 1982 and heard the testimony of five witnesses. Ten exhibits were admitted in evidence at the

hearing. By agreement of the parties, the depositions of two additional witnesses were taken on April 5, 1982 and filed April 15, 1982.

Chief Magistrate Hamilton's 23 page report proposed that this Court make 73 separate findings of fact and recommended that this Court enter an order denying the petition for writ of habeas corpus. The case now pends on petitioner's timely filed objections to that portion of the magistrate's report and recommendation which proposes that this Court make findings that no promises were made to Roderick Henderson and John L. Thomas, key prosecution witnesses for the State, in exchange for their testimony at petitioner's trial.

We have considered the magistrate's proposed findings of fact and his recommendation in light of all the evidence adduced at the evidentiary hearing. For reasons we shall state in detail, we have determined that the petitioner's objections to the identified portions of the magistrate's proposed findings of fact and to his recommendation based on those findings should be sustained.

## II.

■ The Federal Magistrates Act, 28 U.S.C. § 636(b)(1)(B) does not vest authority in the magistrate to make a final and binding disposition of matters referred under the Act. Rather, that Act provides that within ten days after the magistrate files his proposed findings of fact and recommendations, any party may file objections and that thereafter:

A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions. 28 U.S.C. § 636(b).

The magistrate's report accurately states that petitioner presented four separate claims for federal habeas relief, namely, (1) that he was denied a fair trial because of promises made to prosecution witnesses which were not disclosed at trial; (2) that he was denied effective assistance of counsel; (3) that an improper amendment of the information was allowed prior to trial; and (4) that the State trial judge improperly commented on the evidence.

Petitioner did not specifically object to any portion of the magistrate's proposed findings and recommendation other than those made in connection with petitioner's first claim based on the alleged undisclosed promises made to the prosecution's two principal witnesses. This Court's *de novo* determination is thus limited to the portions of the magistrate's proposed findings and recommendation that relate to petitioner's first claim.

■ *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) makes clear that the "*de novo* determination" contemplated by the Congress in the amended Federal Magistrates Act requires that the district judge shall consider the record developed before the magistrate and make his own determination on the basis of that record, without in any way being bound to adopt the findings and conclusions proposed by the magistrate. *Vekamaf Holland B.V. v. Pipe Benders, Inc.*, 671 F.2d 1185 (8th Cir.1982), appropriately stated that "In the passage of the Federal Magistrates Act, Congress did not intend an erosion of the underlying responsibilities and policies of the Article III judicial office." That case requires that district judges in the Eighth Circuit analyze and make a reasoned response to all objections made to a magistrate's report and recommendations in order to provide proper and discernible grounds for appellate review. In short, the *de novo* determination required by the Congress under the Act is an entirely different standard than the "clearly erroneous" standard provided in Rule 52(a) of the Federal Rules of Civil Procedure.

## III.

Our consideration of the record developed by the magistrate establishes that a sub-

stantial number of the findings which relate to petitioner's first claim should and will be adopted as proposed. The first 51 of the total 73 findings proposed by the magistrate relate to that claim. We accept the following findings proposed by the magistrate and indicate in parenthesis the particular findings proposed by the magistrate which we reject:

1. On February 7, 1971, an information was filed in the Circuit Court of Jackson County, Missouri, charging that Sims, on January 23, 1971, "* * * did then and there unlawfully, feloniously, wilfully and maliciously set fire to and burn a certain dwelling house of one Vera J. Jefferson, located at 4211 E. 60th Terr., Kansas City, Jackson County, Missouri, in which said dwelling house there was then and there a human being; * * *" (Pet.Ex. 1 at page 2).

2. On March 8, 1971, Deickman was appointed to represent Sims (Pet.Ex. 1 at pages 4 and 5).

3. On October 19, 1971, an amended information was filed charging Sims, on January 23, 1971, " * * * did then and there either acting alone or knowing[ly] acting in concert with others, unlwfully (sic), feloniously, wilfully and maliciously set fire to and burn a certain dwelling house of one Vera J. Jefferson, located at 4211 East 60th Terrace, Kansas City, Jackson County, Missouri, in which said dwelling house there was then and there a human being; * * *" (Pet.Ex. 1 at pages 18 and 18–A).

4. The amended information is identical to the original information except for the addition of the words "either acting alone or knowing[ly] in concert with others" (Pet.Ex. 1 at pages 2, 18 and 18–A).

5. (Rejected).

6. On October 19, 1971, the trial of Sims on the charge set forth in the amended information commenced in Division No. 8 of the Circuit Court of Jackson County, Missouri, before a jury, with the prosecution represented by Assistant Prosecuting Attorney John Peak and the defendant represented by Deickman (Pet.Ex. 1 at page 19).

7. During the trial, Roderick Henderson (Pet.Ex. 1 at pages 42–61) and John Thomas (Pet.Ex. 1 at pages 61–89) testified as witnesses for the prosecution.

8. The testimony of Roderick Henderson (hereafter "Henderson") and John Thomas (hereafter "Thomas") was very material and vital to the prosecution's case and quite damaging to the defendant (Pet.Ex. 1 at pages 42–61 and 61–89).

9. (Rejected).

10. (Rejected).

11. (Rejected).

12. On October 20, 1971, the jury found Sims guilty of the offense of arson, as charged in the amended information, and fixed punishment at imprisonment by the Department of Corrections for not less than 40 years (Pet.Ex. 1 at page 187).[1]

13. (Rejected).

14. On December 2, 1971, the Honorable Lewis W. Clymer, Judge of Division No. 8 of the Circuit Court of Jackson County, Missouri, entered judgment and sentenced Sims to imprisonment for a term of 40 years (Pet.Ex. 1 at 203).

15. Edward J. Houlehan (hereafter "Houlehan") represented Henderson in the Circuit Court of Jackson County, Missouri, in Case No. C–40922, in which Henderson was charged with the same arson offense that Sims was charged.[2]

16. Houlehan does not recall being at a conference on March 4, 1971 at which J. Martin Kerr (hereafter "Kerr"), Assistant Prosecuting Attorney, Henderson, Hender-

1. We have modified finding no. 12 by changing the "October *19,* 1971" date to "October *20,* 1971." Page 188 of the transcript of the trial does show an October 19, 1971 date, but other portions of the trial transcript, pages 99–100, show that the jury returned its verdict on October 20, 1971, the second day of the two day trial.

2. Modified to reflect that Henderson was

son's mother, and himself were present (Tr. 13–16).[3]

17. Kerr does not recollect engaging in a conversation with Houlehan, Henderson, and Henderson's mother on March 4, 1971 (Tr. 60–61). Kerr does not recall writing a handwritten note on March 4, 1971 but he recognizes it is his handwriting. The note reads:

Talked to Henderson, his mother, and his attorney, Mr. Ed Houlehan, in my office in regard to Henderson testifying for the State against J.C. Sims on the fire bombing on 60th Street Terrace. I told him the State would probably not reduce to malicious destruction of property, but would either recommend probation or a light sentence on a guilty plea or recommend a suspended imposition of sentence. Henderson's statement to police after arrest is accurate, according to Henderson. According to Sims' attorney, Carl Perry, Sims has denied even knowing any of the youths involved in the bombing. Mrs. Henderson remembers Sims coming to their home to see Roderick (Henderson) on Tuesday, January 27th, 1971. She may be useful on rebuttal for the State. (Tr. 62–63).[4]

18. Kerr testified that while he doesn't remember writing the note, the note reflects an agreement he must have had with Henderson and his attorney as to the disposition of the Henderson case and it obviously was put in the Sims file (Tr. 63–64).

19. Kerr testified that he would consider an agreement made by him to have been binding on the Prosecutor's office (Tr. 66).

20. Houlehan was not aware of the note or memo written by Kerr until just prior to March 23, 1982 (Tr. 23).[5]

21. (Rejected).

22. (Rejected).

23. (Rejected).

24. On April 21, Henderson entered a plea of guilty to the same charge of arson that Sims was later convicted. He was not sentenced until after Sims was tried and convicted.[6]

25. On January 7, 1972 Henderson appeared before the Honorable Tom J. Stubbs, Judge of Division No. 5, Circuit Court of Jackson County, Missouri, for imposition of sentence (Pet.Ex. 3 at page 1–7). Imposition of sentence was deferred and Henderson was placed on probation for a period of four years (Pet.Ex. 3 at page 7).[7]

26. (Rejected).

27. (Rejected).

28. (Rejected).

29. Jerome F.X. Waterman (hereafter "Waterman"), represented Thomas in the Circuit Court of Jackson County, Missouri in Case No. C–41132, in which Thomas was charged with the same arson offense that Sims was charged.[8]

30. (Rejected).

31. On November 1, 1971, shortly after he had testified against Sims, Thomas entered a plea of guilty to the same arson charge that Sims had been convicted on October 20, 1971.[9]

charged with the same arson offense as Sims.

3. The fact that Houlehan does not presently recall the conference is not of controlling significance.

4. The fact that Kerr has no present recollection of the conference is not of controlling significance. The recordation of the conference and Kerr's testimony of his understanding of his handwritten note, as stated in the magistrate's proposed findings Nos. 18 and 19, which we accept as proposed, is of significant evidentiary value.

5. The fact that Houlehan did not know of Kerr's written memo is not of controlling significance.

6. Modified to reflect that Henderson had not been sentenced at the time he testified against Sims.

7. Modified to correct January 7, 1982 to January 7, 1972.

8. Modified to reflect that Thomas, like Henderson, was charged with the same arson offense as Sims.

9. Modified to show that Thomas, after being advised of his rights by the trial judge (Pet.Exh. 1, pp. 62–64), admitted his participation in the arson in his testimony at Sims' trial *before* he had entered his plea of guilty to the same offense.

32. On February 4, 1972 Thomas appeared before the Honorable J. Donald Murphy, Judge of Division No. 11, Circuit Court of Jackson County, Missouri, for the imposition of sentence. The State was represented by Peak and Thomas was represented by Waterman. Thomas' mother was also present. (Pet.Ex. 4 at pages 1–2).

33. During the sentencing proceeding, Judge Murphy inquired of Peak if he had a recommendation. Peak's response was as follows (Pet.Ex. 4 at page 5):

No, I would like to point out in line with the adjustment he has made since the time of his arrest and plea of guilty he has also been very helpful to the State in another trial and was largely responsible for the trial ending in a conviction and sentence of forty years. That trial involved the man who apparently influenced Mr. Thomas to commit this crime and under those circumstances, the State has no recommendation but we are not opposed to probation in this case.

34. Judge Murphy, in the same manner as had Judge Stubbs in the *Henderson* case, suspended imposition of sentence and placed Thomas on probation for a period of four years (Pet.Ex. 4 at page 6). Judge Murphy, in the course of imposing sentence, stated that "in a case as serious as this is, I don't often suspend imposition of sentence." He further confirmed, in an obvious reference to the *Henderson* case, that "in one of the other divisions, imposition was suspended on another young man who was involved in this" before suspending sentence and placing Thomas on the same probation that

Judge Stubbs had earlier granted Henderson.[10]

35. (Rejected).

36. (Rejected).

37. (Rejected).

38. While Waterman has no independent recollection of conversations with Peak regarding Thomas testifying as a prosecution witness (Waterman's deposition at page 4), Peak's statement during the sentencing proceeding appears to reflect Peak making good on his promise that the State would not oppose probation (Waterman's deposition at pages 13–14).

39. Douglas N. Merritt (hereafter "Merritt"), a former Assistant Public Defender for Jackson County, Missouri, was appointed to represent Sims in connection with a Rule 27.26 proceeding in the Circuit Court of Jackson County, Missouri (Tr. 34–35).[11]

40. During an appearance before Judge Clymer in the Rule 27.26 proceeding, Merritt, in urging that Sims was entitled to a hearing, made the following offer of proof (Tr. 37–38; Pet.Ex. 5 at pages 33–34):

Mr. Edward Houlihan (sic), an attorney in this city, represented Roderick Henderson, a witness in the case of *State v. Sims.* Mr. Houlihan (sic) would testify that his client plead (sic) guilty and received probation; he would say that he advised his client that he would benefit by testifying, and that he, Mr. Houlihan (sic), would recommend a suspended imposition of sentence, and that Mr. Peak, the prosecutor had agreed not to object or oppose that recommendation.

10. We have modified the magistrate's proposed finding to more fully reflect Judge Murphy's remarks at the time of Thomas' sentencing.

11. While we have accepted the magistrate's proposed findings Nos. 39, 40 and 42, all of which relate to petitioner's unsuccessful attempt to invoke Missouri Rule 27.26, it must be noted, as we stated in detail in our December 22, 1981 order, that the State trial judge, in violation of Missouri Rule 27.26, refused to appoint counsel for the petitioner in connection with petitioner's original Rule 27.26 motion filed in 1974. While it is true that Merritt was appointed "in connection with a Rule 27.26 proceeding," he was not appointed until long after petitioner's original Rule 27.26 motion had been denied without appointment of counsel and without a hearing. Merritt was not appointed to represent the petitioner until March 24, 1975, (see page 9A of Pet.Exh. 5), at a time after the time for appeal of the State trial judge's denial of the original Rule 27.26 motion had expired.

The State trial judge refused to "reopen" the original Rule 27.26 proceeding and the Missouri Court of Appeals, Kansas City District, in an unreported opinion, concluded that the State trial court was without jurisdiction to do so. See our detailed discussion of these matters in our December 22, 1981 order.

I think it is clear from that that the testimony was elicited by offer of clemency or leniency by the prosecutor.

Mr. Jerome Waterman, an attorney in this city, would also testify that he was counsel for John Thomas, a witness in this case of *State v. Sims,* who also testified for the State against Mr. Sims. Mr. Waterman would state that he had conversations with the prosecutors (sic), Mr. John Peak, and he would say essentially the same as Mr. Houlihan (sic) said, that he could not promise leniency but he could reasonably expect good treatment if he testified and that because of his testimony and his age and other undetermined factors, he should reasonably expect probation for his part in the arson. That, in fact, did happen, both Thomas and Henderson did testify for the State against him, much to his harm.

41. (Rejected).

42. Merritt testified that the offer of proof was based upon statements Houlehan and Waterman made to him (Tr. 42).[12]

43. Houlehan remembers talking with Merritt but does not remember what was said (Tr. 18). (Waterman was not asked during his deposition whether he ever talked with Merritt about the Sims case).

44. Peak served as an Assistant Prosecuting Attorney for Jackson County, Missouri, from early 1969 until about June of 1972 (Peak's deposition at page 3).

45. Peak was assigned to try and did represent the State at the trial of *State of Missouri v. June Charles Sims,* (Peak's Deposition at pages 4–5).

46. (Rejected).[13]

47. (Rejected).

48. (Rejected).

49. (Rejected).

50. (Rejected).

51. (Rejected).

### IV.

In addition to our rejection of the particular numbered paragraphs of the magistrate's proposed findings as identified in Part III, *infra,* we also sustain petitioner's objection to various additional findings and inferences made and drawn by the magistrate in other portions of his report in regard to petitioner's first federal habeas claim.

We note at the outset that petitioner's objection to the magistrate's reiterated comments concerning particular witnesses' lack of independent recollection of what

---

**12.** Modified by eliminating the magistrate's emphasis that Merritt's testimony was given "on redirect examination."

**13.** The magistrate's proposed findings 46 through 51, all of which we expressly reject, were based solely on portions of Peak's deposition testimony. The State relied solely upon Peak's deposition testimony to support 26 of the 39 proposed findings of fact filed with the magistrate in connection with petitioner's first claim.

While the magistrate did not adopt all of the State's proposed findings, it is clear that he adopted the rationale upon which the State's proposed findings were based. Indeed, the magistrate expressly stated that he had "no reason to doubt the credibility of Mr. Peak and the truthfulness of his testimony" (p. 15 of the magistrate's report).

Peak's credibility is not a particularly relevant consideration in the determination of the case. The actions of the participants, including Peak's actions, speak more clearly than Peak's conclusory deposition testimony. While Peak, for example, might have had personal knowl-

edge of whether he could "remember a single instance when he recommended probation or parole," as the magistrate's proposed finding No. 48 would have this Court find, Peak's general testimony in regard to plea bargaining cannot be said to support that portion of the magistrate's proposed finding No. 48 that would have this Court find that "during the time Peak was an Assistant Prosecuting Attorney, plea bargaining was not engaged in."

The State properly recognized on page 7 of its brief that in his deposition testimony, "Peak did speak in general terms that should a prosecutor and defense attorney agree on a recommendation, the trial court might go along with the recommendation when imposing sentence." Such general testimony cannot be said to support the magistrate's proposed finding.

This case, of course, does not present the question of how the Jackson County, Missouri plea bargaining system operated in general; this case presents the question of how that system operated in this particular case.

occurred at petitioner's trial and his subsequent efforts to obtain appropriate Rule 27.26 relief must be sustained.[14] The fact that particular witnesses testified that they had no present independent recollection of particular conversations or of particular exhibits in evidence does not support the rationale of the magistrate's factual analysis of all the facts and circumstances in evidence.

On page 14 of his report the magistrate stated in regard to witness Thomas that:

> There is nothing in the record to reflect that any promise had been made to Thomas in exchange for his testimony except (1) the statement of Mr. Peak, during the sentencing of Thomas, that "we are not opposed to probation in this case" and (2) the offer of proof made by Merritt during the Rule 27.26 proceeding on October 14, 1975, . . ." [15]

On the same page of his report, the magistrate stated the following in regard to witness Henderson:

The only evidence in the record that tends to support Sims' contention that a promise had been made to Henderson in exchange for his testimony is (1) the note or memorandum dated March 4, 1971, authored by J. Martin Kerr, and (2) the offer of proof made by Merritt during the Rule 27.26 proceeding on October 14, 1975, . . . ." [16]

On the top of page 15 of his report, the magistrate quoted one paragraph from the prosecutor's March 4, 1971 Henderson memorandum (Pl.Exh. 2, quoted in full in our finding No. 17 above) and thereafter speculated about what inferences, if any, should be drawn from that exhibit. The magistrate again made reference to Kerr's lack of "independent recollection of the [Henderson] conference" and posed a rhetorical question in regard to how the prosecutor's memorandum should be considered. The magistrate also speculated about particular testimony given by Houlehan on cross ex-

---

**14.** On both pages 2 and 13 of his report, the magistrate noted that the petitioner had waited approximately nine years to file a petition for a [federal] writ of habeas corpus and that, consequently, most of the witnesses had no independent recollection of what occurred in 1971. The magistrate further noted on page 14 of his report particular matters about which J. Martin Kerr, Edward J. Houlehan, and Jerome F.X. Waterman lacked any present recollection.

The delay in obtaining a hearing on the merits of petitioner's federal constitutional claims cannot properly be charged to the petitioner. We need not restate the factual circumstances already stated in our memorandum opinion of December 22, 1981, which establish the manner in which the Missouri Court of Appeals, Kansas City District, in 1973 refused to consider the merits of petitioner's first federal constitutional claim on direct appeal, see *State v. Sims,* 501 S.W.2d 161, at 162 (Mo.App.1973); how the State trial court refused in 1974, in direct violation of Missouri Rule 27.26, to appoint counsel to represent petitioner in that proceeding and to grant an obviously required plenary evidentiary hearing in connection with the merits of petitioner's original 1974 Rule 27.26 motion; and how the Missouri Court of Appeals, Kansas City District, in an unreported opinion, concluded in 1976 that the State trial court had no jurisdiction in 1975 to "reopen" petitioner's original Rule 27.26 motion in order to hear the

merits of petitioner's first federal constitutional claim.

The files and records in each of those State court proceedings establish that counsel representing the State of Missouri successfully resisted petitioner's efforts to obtain a hearing on the merits of his federal constitutional claims in all of the foregoing State court proceedings. While the passage of time and loss of memory is to be regretted in this, as in all State prisoner post-conviction cases, the remedy is in the control of the State courts which need only appoint counsel and hold appropriate evidentiary hearing on the merits of federal constitutional claims, as expressly required by Missouri Rule 27.26, rather than forcing the federal courts to determine whether, on the merits, a particular defendant was convicted in accordance with the Constitution. Certainly, a State prisoner is not to be faulted for the delay occasioned by the refusal of the State courts to comply with their own post-conviction rules.

**15.** We have omitted the applicable portion of Merritt's offer of proof quoted by the magistrate. That offer of proof is stated in full in our finding No. 40 above.

**16.** We have again omitted from our quotation of the magistrate's statement the applicable portion of Merritt's offer of proof which, as above noted, is stated in full in our finding No. 40 above.

amination by the Assistant Attorney General of Missouri.[17]

The magistrate stated the following in further regard to the issue of whether promises had in fact been made to Henderson and Thomas in order to obtain their testimony as key prosecution witnesses:

> Roderick Henderson testified, under oath, at the Sims trial that no promises had been made to him in exchange for his testimony (Pet.Ex. 1 at pages 56–57). Likewise, John L. Thomas testified, under oath, at the Sims trial that no promises had been made to him in exchange for his testimony (Pet.Ex. 1 at page 65). Mr. Peak categorically denied that any promise had been made to Henderson and Thomas in exchange for their testimony (Peak's Deposition at pages 10, 13–15, 25, 27–28).
>
> The undersigned has no reason to doubt the credibility of Mr. Peak and the truthfulness of his testimony.[18]

The magistrate did not discuss any of the legal authorities relied upon by the petitioner. The rationale of the magistrate's analysis of the case is apparent from the following statement on page 16 of his report:

> On the basis of (1) the sworn denial of Henderson and Thomas at the Sims trial that no promises had been made in exchange for testimony, and (2) the testimony of Mr. John Peak, taken by deposition on April 5, 1982, that the prosecution, in fact, made no promises to Henderson and Thomas in exchange for testimony at the Sims trial, *the undersigned makes the proposed ultimate finding of fact that no promises were made to Roderick Henderson and John L. Thomas in exchange for testimony at the Sims trial.*
>
> In view of the ultimate finding of fact, the petitioner's contention that he is entitled to relief because the prosecution failed to disclose promises made to prosecution witnesses at the trial is without merit.[19] (emphasis the magistrate's.)

---

**17.** The complete statement on page 15 of the magistrate's discussion summarized in the text was as follows:

Since Kerr has no independent recollection of the conference and does not remember writing the note summarizing the conference, there is no way of determining who "him" was. Was he referring to Henderson or to Henderson's attorney, Mr. Houlehan? Since the paragraph quoted above mentions reduction of the charge, it quite likely is that "him" referred to Houlehan. If that assumption is correct, was the statement regarding the recommendation of the prosecution in respect to sentence made in the presence of Henderson or later communicated to him by Houlehan? Mr. Houlehan testified that the Kerr note or memo does not indicate a binding promise on the part of the prosecution but was an expression of intent. Houlehan knew that Kerr could be overruled by someone above him (Tr. 22). Houlehan does not believe there was a binding agreement with the prosecutor. If there had been an agreement, he does not believe that he would have written the two letters to Boystown seeking recommendations on behalf of Henderson (Tr. 26). If Kerr did, in fact, make the statement in respect to the recommendation of the prosecution regarding sentence and if it was made only to Houlehan, it may have been that Houlehan did not communicate it to Henderson because he did not consider it to be a binding promise on the part of the prosecution.

**18.** The credibility of Mr. Peak and the truthfulness of his testimony in regard to whether any promise had been made to Henderson and Thomas in exchange for their testimony is really not in issue. For it is clear that all Mr. Peak could testify about was whether *he* may have made any promises to those prosecution witnesses.

It must also be noted that the magistrate was in no better position to judge Mr. Peak's credibility than this Court, for the reason that Mr. Peak testified by deposition rather than as a live witness. It will also be clear from what we shall later state in the text that we reject a substantial amount of Mr. Peak's deposition testimony which we view as being entirely inconsistent with the actions of Henderson and Thomas and the actions of their experienced counsel and the other undisputed factual circumstances of this case.

**19.** The magistrate also stated on page 20 of his report that "the undersigned has found that promises were not made to Thomas and Henderson in exchange for the testimony. Therefore, additional investigation would not have revealed promises of leniency which were not made." While that statement was made in connection with petitioner's ineffective assistance of counsel claim, it reflects the magistrate's ultimate finding of fact in regard to the question of whether promises were in fact made to Henderson and Thomas.

The magistrate concluded his report by stating that:

As the undersigned has (1) found that the prosecution did not withhold promises made to Henderson and Thomas in exchange for their testimony because no promises were made to these two witnesses, ... it is the recommendation of the undersigned that the Court enter its order denying the petition for writ of habeas corpus.[20]

We sustain the petitioner's objection to the portions of the magistrate's report discussed in this Part IV in which the magistrate stated that there was not sufficient evidence in the record to establish that promises were in fact made to Thomas and Henderson for their testimony. We also sustain petitioner's objection to that portion of the magistrate's report which stated that the trial testimony of Thomas and Henderson and the deposition testimony of Peak supports the magistrate's proposed finding that no promises were in fact made in exchange for the testimony of those key prosecution witnesses.

Our *de novo* consideration of all the evidence adduced at the habeas hearing before the magistrate requires that this Court reject the magistrate's recommendation that the petition for habeas corpus be denied. We turn now to the reasons our *de novo* determination of the case requires that petitioner be granted appropriate habeas relief.

## V.

### A.

The evidence adduced at the hearing before the magistrate must be considered in light of the plea bargaining practices and procedures followed by the Circuit Court of Jackson County, Missouri, at the time petitioner was tried and convicted. The petitioner was convicted on October 20, 1971, exactly two months before the Supreme Court of the United States handed down *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427. *Santobello,* based on federal constitutional due process grounds, held that a plea bargain made by one member of a State prosecutor's staff that no recommendation would be made as to sentence in exchange for a prosecution witness's plea of guilty to a lesser-included offense could not be violated by another member of the prosecutor's staff who, at the time of sentence, and in violation of the plea bargain agreement, actually recommended a maximum sentence.

*Santobello* was a landmark case in the administration of criminal justice throughout the United States in that, for the first time in the history of the Court, the practice of plea bargaining received the approval of the Court.[21] *Santobello* concluded that:

The disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called "plea bargaining," is an essential component of the administration of justice. Properly administered, it is to be encouraged.

*Santobello* added that "disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons." After stating the reasons which the Court considered as supporting the well established

---

**20.** We have omitted the magistrate's summary of his findings in regard to petitioner's other three claims for the reason that the petitioner has not objected to the portions of the magistrate's report and recommendation which relate to those claims.

**21.** *Shelton v. United States,* 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958) is sometimes cited as an earlier Supreme Court approval of plea bargaining. While the Fifth Circuit's opinions in *Shelton* reflect a then growing and substantial concern about the fundamental fairness of the plea bargaining process, it must be noted that the Supreme Court did no more in *Shelton* than accept the Solicitor General's confession of error and reverse the Fifth Circuit's en banc opinion in that case, reported in 246 F.2d 571 (5th Cir. en banc 1957), which had rejected a Fifth Circuit panel opinion, reported in 242 F.2d 101 (5 Cir.1957), which had reversed the district court's refusal to set aside the defendant's plea of guilty obtained by the prosecution's promise that the defendant would receive a sentence of only one year.

practice of plea bargaining, the Court made clear that "all of these considerations presuppose fairness in securing agreement between an accused and a prosecutor." The Supreme Court vacated the New York conviction based on defendant's plea of guilty and remanded the case with directions that petitioner obtain either specific performance of his plea bargain or be afforded an opportunity to withdraw his guilty plea.

Justice Douglas' concurring opinion in *Santobello* reflects that the Court was familiar with the then recent discussion of plea bargaining in the *President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Courts* (1967). *See* 404 U.S. 264, fn. 2, 92 S.Ct. 499, fn. 2. That Report accurately stated that "because of the invisibility of the plea bargaining system, the essential issues involved have generally not received adequate consideration by the courts" and that, therefore, the Report did not attempt to "resolve the issue whether a negotiated guilty plea system is a desirable method of dealing with cases." *Id.* p. 10.

The Report did, however, accurately describe the manner in which the plea bargaining system operated throughout the United States. On page 9 of the Report, the page cited by Justice Douglas' concurring opinion in *Santobello,* it was stated that:

> The system usually operates in an informal, invisible manner. There is ordinarily no formal recognition that the defendant has been offered an inducement to plead guilty. Although the participants and frequently the judge know that negotiation has taken place, the prosecutor and defendant must ordinarily go through a courtroom ritual in which they deny that the guilty plea is the result of any threat or promise. As a result there is no judicial review of the propriety of the bargain—no check on the amount of pressure put on the defendant to plead guilty. The judge, the public, and sometimes the defendant himself cannot know for certain who got what from whom in exchange for what.

Not only did State and federal trial courts before *Santobello* indulge in "courtroom ritual in which [the participants] deny that the guilty plea is the result of any threat or promise," appellate courts in various jurisdictions not infrequently indicated that plea bargaining would not be countenanced as a proper part of the administration of criminal justice. *See,* for example, the Supreme Court of Missouri's statement in *State v. Christian,* 245 S.W.2d 895, 897 (Mo.Sup.Ct.1952): "It is fundamental that no agreement concerning punishment can be made between a defendant in a criminal case and police or prosecuting officers, which is binding on the Court, and therefore, public policy does not favor such bargaining for punishment."

The impact of *Santobello* on the view of Missouri courts in regard to plea bargaining was immediate. Although the Supreme Court of Missouri denied post-conviction relief in *Bradley v. State,* 494 S.W.2d 45, 48 (Sup.Ct.Mo.1973), that court, in reliance upon *Santobello,* stated that "plea bargaining is recognized by the federal courts as well as this Court as an accepted practice." Later, in *State v. Hoopes,* 534 S.W.2d 26 (Mo.Sup.Ct. en banc 1976), the Supreme Court of Missouri applied the rationale of *Santobello* on direct appeal and reversed and remanded the case for a new trial. In *Hoopes* the defendant was charged with robbery and murder. A plea bargain was agreed upon which anticipated that if the defendant would plead guilty to the robbery charge, the prosecutor would recommend a ten year sentence on that charge and would also dismiss the murder charge.

Defense counsel accordingly prepared a written statement for the defendant's signature which stated that "by signing this affidavit and plea, [the defendant] is entering a plea of guilty to robbery and not first degree murder." The prosecutor, in spite of the fact that he confirmed that he had entered into the plea bargain, nevertheless had a change of mind and insisted that the defendant be tried for both robbery and murder. The defendant was tried for both offenses. At that trial, the trial court ad-

mitted in evidence the defendant's affidavit and plea in regard to the robbery charge. The defendant was convicted on both the robbery and murder charges.

The Supreme Court of Missouri reversed and remanded for a new trial, holding that the prosecuting attorney could not renege on his plea bargaining agreement and thereafter use the defendant's intended guilty plea against the defendant at trial.

After discussing various earlier Missouri cases, *Hoopes* noted that "more recently in *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), a conviction on a plea of guilty was vacated because the prosecutor did not perform his part of an agreement that was entered into between the prosecution and defense reference a plea of guilty." The Supreme Court of Missouri quoted several paragraphs from *Santobello,* including the paragraph in which the Court approved plea bargaining as "an essential component of the administration of justice." *Hoopes* added that "what is said supra of the federal courts is equally applicable to state courts."

*Shepard v. State,* 549 S.W.2d 550 (Mo. App.1977), is another example of how Missouri courts have properly applied the principles enunciated in *Santobello* in post-conviction proceedings. In *Shepard* the State conceded that a plea bargain had been agreed upon by an assistant prosecuting attorney and the defendant's original counsel under which the State agreed not to make any recommendation as to the sentences to be imposed on two separate charges to which the defendant agreed to enter guilty pleas. At the time of sentencing, however, the prosecuting attorney, contrary to his earlier commitment, recommended that maximum sentences be imposed on both charges. The Missouri Court of Appeals, in express reliance upon *Santobello,* vacated the sentences and remanded the case for further proceedings.

*Shepard* noted on the facts that "this record is clear that the prosecutor acknowledged that part of the plea bargain agreement was that the state would make no recommendation as to sentences." *Shepard* stated on the facts that "neither [the prosecuting attorney] nor the trial court saw 'Santobello as a lion in the streets.' *Geisser v. United States, supra.*" [513 F.2d 862, 870–71 (5 Cir.1975)].[22] *Shepard* reversed the trial court, concluding that "the far-reaching principle of *Santobello*" required the trial court to fashion an appropriate remedy that would enforce the defaulted plea bargain.

*Schellert v. State,* 569 S.W.2d 735 (Mo. Sup. en banc 1978), decided by the Supreme Court of Missouri en banc in 1978, reflects Missouri's present plea bargain system. That system is an entirely different system than the "invisible," to use the Task Force Report's description, system in operation in the courts of Missouri before *Santobello* was decided. *Schellert,* on its facts, involved a plea bargain under which it was agreed that if the defendant would "plead guilty the state would recommend probation." *Id.* at 736. The defendant entered his guilty plea. The prosecutor complied with the agreement at the time of sentence. The trial court, however, imposed a maximum sentence.

*Schellert* makes clear that the State trial judge was under the impression that he could totally disregard the plea bargain. For the Supreme Court noted that he advised the defendant at the time he accepted defendant's guilty plea that the recommendation made by the prosecutor pursuant to the plea bargain was only a "recommendation" and was "'nothing more than that' and that the court had authority to impose different punishment" *Id.* 736. The *Schellert* court added that "at no time prior to imposition of sentence did the court inform defendant the court was not going to follow the recommendation of the prosecutor, and

22. *Shepard* earlier quoted the following passage from the Fifth Circuit's opinion in *Geisser:* "What we are saying is that the United States Government must in the light of the commitment made by its prosecutorial arm look care-fully at the constitutional obligations owing Bauer. When it looks * * * all will see *Santobello* as a lion in the streets * * *. Thus, following *Santobello,* defaulted plea bargains must be remedied."

this being the case, of course the occasion never arose whereby the appellant was given an opportunity thereafter to withdraw his plea."

After ordering transfer from the Missouri Court of Appeals, St. Louis District, which had affirmed the trial court's denial of defendant's Rule 27.26 motion, the Supreme Court of Missouri, en banc, reversed and remanded to the trial court for the entry of a new plea for the reason that "as a matter of substantial fairness, a trial court should afford a criminal defendant the opportunity to withdraw a plea of guilty in any case in which the judge determines not to grant the sentence concessions contemplated by a plea agreement or plea bargain made between the defendant and the prosecutor."

Judge Seiler's scholarly opinion in *Schellert* traced the history under which the former invisible plea bargaining system had been brought out into the open by *Santobello* and stated that:

> Plea bargaining has thus become accepted by the courts as "a legitimate and respectable adjunct of the administration of the criminal laws." *State v. Thomas,* 61 N.J. 314, 321, 294 A.2d 57, 61 (1972). There is "nothing unholy in honest plea bargaining between the prosecutor and defendant and his attorney in criminal cases." Id., quoting *State v. Taylor,* 49 N.J. 440, 455, 231 A.2d 212, 221 (1967). *Id.* 738.

The rule of decision announced in *Schellert* in 1978 anticipated the eventual promulgation of Missouri Criminal Rule 24.-02(d)(4), adopted by the Supreme Court of Missouri June 13, 1979, effective January 1, 1980.[23] Indeed, Judge Finch's concurring opinion in *Schellert* accurately stated that "what the principal opinion proposes without so stating is the adoption of the provisions of Rule 11(e)(4) of the Federal Rules of Criminal Procedure except for the refer-

ence therein to plea of nolo contendere." Judge Finch noted that the Supreme Court of Missouri's Standing Committee on Rules had recommended that "this court do precisely that" and expressed his preference that the existing rule be amended by the adoption of a new rule rather than by judicial decision.

The point of *Schellert,* however, is that the rule of decision announced in that case, and the eventual adoption of Missouri's Criminal Rule 24.02 is in full accord with the principles stated in *Santobello* and provides for appropriate due process procedures consistent with the position of those who believe that plea bargaining is "an essential component of the criminal justice system" and that "properly administered it should be used and should be encouraged." Such a system, of course, was not in place at the time of petitioner's trial.

### B.

While *Santobello* was not on the books at the time the petitioner was convicted, that case was decided before either Thomas or Henderson were sentenced. The notion that nothing could be done to enforce any plea bargain that may have been made in order to obtain the testimony of the prosecution's two key witnesses simply ignores the impact of *Santobello* on the "invisible," plea bargaining system as it existed in the Circuit Court of Jackson County, Missouri.

Application of *Santobello's* rationale requires that this Court sustain the petitioner's objection to various of the magistrate's proposed findings which, in effect, reflect the magistrate's acceptance of testimony that no binding plea bargains could be entered into between the prosecutor's office and defense counsel and that nothing could be done to enforce any plea bargain that may have been made in regard to what

---

**23.** Missouri Criminal Rule 24.02(d)(4), patterned on F.R.Cr. 11(e) provides:

4. *Rejection of a Plea Agreement.* If the court rejects the plea agreement, the court shall, on the record, inform the parties of this fact, advise the defendant personally in open court or, on a showing of good cause, in

camera, that the court is not bound by the plea agreement, afford the defendant the opportunity to then withdraw his plea, and advise the defendant that if he persists in his guilty plea, the disposition of the case may be less favorable to the defendant than that contemplated by the plea agreement.

treatment Henderson and Thomas would receive in exchange for their testimony against the petitioner.

■ Another principle enunciated in *Santobello* is applicable to this case. In *Santobello,* as in this case, the State contended that the fact a second prosecutor may not have had any knowledge of the existence of a plea bargain agreed to by another member of the prosecutor's staff was a fact of material significance. In *Santobello,* as in this case, the evidence established that the plea bargain agreed upon included a condition that "no sentence recommendation would be made by the prosecutor." The State in *Santobello,* as the State in this case, attempted to avoid the binding effect of the earlier agreement on the theory that the second prosecutor to whom the case was assigned for trial had no knowledge of the plea bargain agreement made by another assistant in the prosecutor's office.

*Santobello* answered that argument by stating that:

The staff lawyers in a prosecutor's office have the burden of "letting the left hand know what the right hand is doing" or has done. That the breach of agreement was inadvertent does not lessen its impact.

The law of Missouri is exactly the same. *State v. Allen,* 530 S.W.2d 415, 419 (Mo. App.1975), involved defendant's appeal from his conviction at a nonjury trial. Similar to the circumstances of this case, it was apparent that "at the trial, in response to a direct question by the prosecutor, the witness Dennis denied she had been promised dismissal of charges for her testimony." The *Allen* court stated, however, that "in fact, a prosecutor at an earlier phase of the proceedings had not only concluded such an agreement with counsel for Dennis, but had also given it effect by the discontinuance of the murder charge after she had testified for the State at the preliminary hearing of the defendant." The court held that, under those circumstances, "the failure of the prosecution to correct the testimony of the witness amounted to suppression of material evidence on credibility, notwithstanding

the trial prosecutor was not aware of the agreement between his predecessor and the Dennis counsel, nor that the denial by the witness of knowledge of such an arrangement was not directly impeached."

The *Allen* court further held:

The office of prosecutor is integral and binds the sovereign in criminal proceedings no matter through which agent it speaks. A promise to the defense made by one prosecutor is imputable to the State and controls the other prosecutors. [530 S.W.2d at 419]

The magistrate's proposed finding No. 47, based solely upon Peak's deposition testimony, to the effect that "Kerr or no one else assigned to the warrant desk in the Jackson County Prosecuting Attorney's Office had authority to enter into a plea bargain agreement that would be binding upon the attorney assigned to try the case," fails to recognize the second principle stated in *Santobello* and in *Allen.*

The petitioner's objection to the magistrate's proposed finding No. 47 must also be sustained on the separate ground that this Court cannot accept Peak's deposition testimony which is directly contrary to the law of Missouri. See Chapter 56, V.A.M.S. in general and § 56.150 V.A.M.S. in particular. The latter section authorizes the appointment of assistant prosecuting attorneys in Jackson County, Missouri and provides that all assistant prosecutors are vested with precisely the same powers and duties. *See* also *State v. Falbo,* 333 S.W.2d 279, 284 (Mo.Sup.Ct.1960), in which the following statement in 27 C.J.S. 730 was adopted as the law of Missouri: "An assistant or deputy prosecuting attorney legally appointed * * * is generally clothed with all the powers and privileges of the prosecuting attorney; and all acts done by him in that capacity must be regarded as if done by the prosecuting attorney himself." And *see* finally, *State v. Tierney,* 584 S.W.2d 618, 620 (Mo.App.1979), in which the court held that under Missouri law the separate office of a *prosecutor* and the separate office of an *assistant prosecutor* "commands from both the same qualifications and the same duty."

In short, Mr. Peak's deposition testimony simply cannot properly be said to support a proposed finding that any member of the prosecutor's staff had any different power and authority than any other member of that staff. Mr. Kerr's testimony set forth in finding No. 19 that "he would consider an agreement made by him to have been binding on the Prosecutor's office" is consistent both with *Santobello* and the law of Missouri.

We turn now to the question of whether promises were in fact made to Henderson and Thomas in exchange for their testimony against the petitioner.

## VI.

### A.

The record made before the magistrate establishes that shortly after January 23, 1971, the date the dwelling house of Vera Jackson located at 4211 East 60th Terrace, Kansas City, Missouri was fire-bombed, the State filed identical charges of arson against the petitioner, Henderson and Thomas.[24]

All three defendants employed counsel. Henderson employed Houlehan, a former assistant Jackson County, Missouri prosecutor (Tr. 12). Thomas employed Waterman,

also a former assistant and later the first assistant Jackson County, Missouri prosecutor. After leaving the prosecutor's office, Houlehan and Waterman formed a partnership for the practice of law and were law partners at the time they represented Henderson and Thomas[25] (Tr. 12).

Plaintiff's Exhibit 2, Kerr's March 4, 1971 memorandum set forth in full in finding no. 17, shows that Henderson had given a statement to the police which prompted Houlehan to contact the prosecutor's office to try to negotiate a plea for his client.[26] That exhibit also establishes that Houlehan, an experienced former prosecutor, knew that he had something to offer for the reason that, as stated in Kerr's memorandum, "Henderson's statement given to police after arrest [showed that] he should make a good witness against Sims." Indeed, Kerr's memorandum shows that Houlehan went to Kerr's office for the express purpose of conferring "in regard to Henderson testifying for the state against J.C. Sims on the fire bombing on 60th Terr."

It is undisputed that Henderson's plea of guilty was accepted on April 12, 1981 (Tr. 20). At the time his plea was accepted, sentencing was deferred until April 26, 1971 (Tr. 20; Defendant's Exhibits Nos. 1 and 2).[27] No one, of course, anticipated that

**24.** The State filed its original information charging petitioner with arson on February 7, 1971 (Tr. 3). For reasons not revealed by the record, the State did not file its information charging Henderson with arson until February 18, 1971 (Tr. 18). Although the record does not show the precise date Thomas was charged, the number assigned his case would indicate that the State filed its information charging Thomas with arson a short time after it had filed its charge against Henderson.

**25.** Petitioner employed one Carl Perry to represent him (Tr. 45). However, petitioner's "funds ran out" (Tr. 45) and Deickman was appointed to represent petitioner on March 8, 1971 (Tr. 4).

**26.** Houlehan testified that he still had in his file a copy of "the statement which Mr. Henderson gave to the Kansas City police department implicating himself and others in this particular fire/bombing incident." (Tr. 19).

**27.** Defendant's Exhibits Nos. 1 and 2 were copies of letters that Houlehan had written two

officials of Boystown, Nebraska "at the suggestion of Mr. Henderson" (Tr. 20). One of those officials replied. The record does not show what the Boystown people may have said about Henderson, who spent four years as a resident of that institution from 1966 to 1970 as a result of car theft difficulties Henderson had gotten into as a juvenile offender (Pl.Exh. 3, p. 4). At any rate, Houlehan testified that "I don't believe I forwarded that response to the Court" (Tr. 20).

The magistrate's proposed finding No. 22 in regard to the Boystown letters and his further reference to those letters do not support the notion that the fact Houlehan had followed Henderson's suggestion that the Boystown's letters should be written requires a finding that "Houlehan did not believe he had an agreement with the prosecution." Petitioner's objection to the magistrate's proposed finding No. 22 and his discussion of the Boystown letters must be sustained for the reason that the magistrate gave undue weight to Houlehan's obviously

Henderson would be sentenced before he testified at petitioner's trial. Accordingly, he was not sentenced on April 26, 1971 as originally scheduled. Rather, he was sentenced on January 7, 1972, after he had testified as a key prosecution witness against the petitioner.

Houlehan did not know that Kerr had made a contemporaneous memorandum of the March 4, 1971 conference which recorded the plea agreement that if Henderson testified against the petitioner, "the State . . . would either recommend probation or a light sentence on a guilty plea or recommend a suspended imposition of sentence". Although Houlehan testified that he had no present recollection of the specifics of his conference with Kerr, Houlehan did recall that he did "understand that [Henderson] was going to testify in the trial, and I knew that it would be very helpful to him if he did testify." (Tr. 20–21). Houlehan reiterated that he "knew that it would be helpful for him if he did testify and cooperate, obviously" (Tr. 21) and that he felt that if Henderson testified, "he had an excellent chance of, say, getting probation" (Tr. 22).

Petitioner's objection to the magistrate's statement on page 14 of the report which stated that "If Kerr did, in fact, make the statement in respect to the recommendation of the prosecution regarding sentence and if it was made only to Houlehan, it may be that Houlehan did not communicate it to Henderson because he did not consider it to be a binding promise on the part of the prosecution" is expressly sustained.

■ We find and conclude as a result of our *de novo* consideration of the record that Kerr did, in fact, make the statement concerning Henderson's recommended sentence, conditioned upon Henderson's plea of guilty and his testimony at trial. We also find and conclude that Houlehan's speculative opinion testimony about Kerr's March 4, 1971 memorandum, the existence of which Houlehan did not learn until the time of the magistrate's hearing, is immaterial. We further find and conclude that Houlehan's speculation about whether he had a "binding" agreement with the prosecution simply reflected his unfamiliarity with the Supreme Court's decision in *Santobello,* decided December 21, 1971, and thus on the books at the time Henderson was sentenced on January 7, 1972.

Henderson, of course, testified as a key witness for the prosecution as everyone anticipated. The fact that he testified on direct examination at the time of petitioner's trial that *Peak* had not made any promises to him if he testified and no one else told him that "it will affect the outcome of your case by testifying in this case" (Pet. Exh. 1, p. 56), simply reflected the State's concealment of the plea bargain commitment that we find Kerr made with Houlehan in regard to Henderson's guilty plea.[28]

As above noted, Henderson's case was finally set for sentencing on January 7, 1972, approximately a month after petitioner was given his 40 year sentence. Judge Stubbs deferred the imposition of any sentence and Henderson was placed on proba-

speculative testimony concerning matters about which he admittedly had no present recollection.

**28.** The concealment of the true circumstances under which Henderson became a key prosecution witness was further compounded by the action of the trial court in sustaining the prosecutor's objection to the question asked Henderson on cross-examination: "Isn't it true, Mr. Henderson, you expect to get a parole?" (Tr. 58) The trial court advised defense counsel that he would not permit Henderson to be cross examined "as to whether he expects anything or not." (Tr. 58).

The record is clear that Kerr's March 4, 1971 memorandum was placed in petitioner's trial

file (Tr. 61), obviously for use by the assistant prosecuting attorney to whom the trial of petitioner's case would be assigned. The record also establishes that the Jackson County prosecutor's office was "not as liberal in discovery then as they are now where you get the whole big file" (Waterman deposition p. 10), and that the Kerr memorandum did not see the light of day until the hearing before the magistrate.

We do not, however, reach the obvious *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1962) question in regard to the failure of the State to produce the Kerr memorandum for the reason that question was not presented in petitioner's habeas petition.

tion for a period of four years (Pet.Exh. 3, p. 5).[29] Thereafter, on April 27, 1972 Henderson was released from probation and all his rights and privileges of citizenship were ordered restored pursuant to Section 549.-111(2) R.S.Mo. Supplemental 1967 (Pet.Exh. 6, p. 6).

### B.

Waterman, Houlehan's law partner, represented Thomas. Although Waterman's deposition testimony reflects his lack of familiarity with *Santobello* and his mistaken "legal conclusion" that it was impossible to negotiate a binding plea agreement "in those days," or even at the present time (Tr. 5),[30] we are satisfied that he and Houlehan discussed the cases against their respective clients (Waterman Deposition 10–11). Waterman's recollection of the manner in which he represented Thomas was refreshed by a note he found in the file which stated in his own handwriting: "Will testify." Although Mr. Waterman had no independent recollection of "discussing with Mr. Peak the possibility of a lightened sentence or anything of that nature in exchange for Mr. Thomas' testimony," (*Id.,* p. 4) his review of "my note where it states 'Will testify' leads me to say that I am sure I did discuss with John Peak the possibility of my client testifying against Sims prior to my client either entering a plea of guilty or being sentenced on the charge" (*Id.* p. 5).

Waterman testified on page 9 of his deposition, and we accept his testimony, that: "I would not have pled John Thomas guilty without some anticipation based upon everything I have referred to and conversation with John Peak, *which I am sure included the notion of testifying,* unless I were satisfied that what happened would have happened, namely, the lightest sentence possible." (Emphasis this Court's.)

The record is clear that Waterman was so confident that the agreement would be carried out that he was not even present at the time Thomas testified for the prosecution at petitioner's trial. Waterman testified that "I would have no reason to be there, because by this time I think my job was done." (Waterman Deposition, p. 6).

The undisputed fact that Waterman believed "my job was done" and the fact that he decided that it was not necessary for him to be present when Thomas testified at petitioner's trial are convincing evidence that Waterman was fully satisfied that his client would be the beneficiary of the plea bargain that Waterman had negotiated on behalf of his client. As Waterman testified, "I had four years as a prosecutor and had many, many times entered into pleas with defense counsel ... and I thought I knew the Jackson County Courthouse and what would happen" (Waterman deposition, p. 8).

Contrary to what the assistant prosecuting attorney told the jury,[31] we find it

---

**29.** Houlehan testified, and we accept his testimony, that it "was a common practice at that time before some of the judges, to have an informal discussion prior to [the judge] taking the bench—during which [defense counsel], the prosecutor and the judge discussed any agreements which may have been made" (Tr. 31). Houlehan, however, could not recall whether that common practice was followed in regard to Henderson's sentencing (Tr. 31). While the existence of the "common practice" is a significant factual circumstance which assists in making the then existing plea bargaining system more visible, we make no finding that the common practice was followed in Henderson's case. At the present time, as we noted in connection with our discussion of *Schellert, infra,* V.A.M.R. 24.02(d), patterned on F.R.Cr.P. 11(e), adopted by the Supreme Court of Missouri on June 13, 1979, effective January 1,

1980 requires all plea bargains to be stated of record.

**30.** Waterman apparently believed that there was a legal distinction between "classic plea bargaining as is done in federal court in Kansas and other states" (Waterman deposition 9) and the invisible plea bargaining system with which he was familiar, both as a prosecutor and as a practicing lawyer. He testified, however, that in regard to the then existing Jackson County, Missouri plea bargaining system "I just knew how the system worked." (Waterman Deposition, p. 8).

**31.** In his closing argument to the jury, the assistant prosecuting attorney misled the jury by stating the following:

Mr. Peak: I will just have a few remarks to make about Mr. Dieckman's argument. He

impossible to believe that Waterman did not know that Thomas' testimony at the petitioner's trial could and would be used against him in the event the plea bargain Waterman had negotiated was repudiated by the State and Thomas was later tried for arson. Thomas, of course, had the right to refuse to testify at petitioner's trial. See *State v. Graham,* 527 S.W.2d 722 (Mo.App. 1975). He also had the right to waive his Fifth Amendment rights. Indeed, when Thomas was called as a prosecution witness, defense counsel, out of the presence of the jury, called the trial court's attention to the fact that "the man should be advised of his rights" (Pet.Exh. No. 1, p. 61). The prosecuting attorney then advised the trial court that "I talked with counsel [for Thomas] and he had no objections to it and said he advised his client of his rights under the Fifth Amendment and that his client wishes to waive his rights" (*Id.* p. 61).[32]

After the trial court suggested to the prosecutor that "maybe you ought to question him outside the presence of the jury" (*Id.* p. 61), the trial court, the prosecuting attorney, and defense counsel proceeded to obtain from Thomas what may, for present purposes, be assumed to be a valid Fifth Amendment waiver. Thomas confirmed that he had talked with Waterman and that he did want to testify (*Id.* 62–64).

We are confident that Waterman actually knew that Thomas' testimony would be admissible against him in the event that Thomas, contrary to the plea bargain, was ever tried for arson. Waterman, as a former first assistant prosecuting attorney, was undoubtedly familiar with the principles stated in the cases cited in the appended footnote.[33] The fact that Waterman did

said he wants you to consider what Mr. Thomas and Mr. Henderson had to gain. Let's consider that. One man has plead guilty, awaiting sentencing, the other man is awaiting trial. *Mr. Thomas didn't have to testify in this case at all. Not at all, and when he is tried, it won't be possible to permit any of the evidence that is heard in this case against him,* what I am saying, *this case will not be mentioned in his trial.* So what does he have to gain in this? I will tell you what they have to gain. They want to see the real culprit in this case, as much as you and I do, get what he deserves, what he has coming. They have nothing to gain in this case, they are on two separate charges. Their charges are not related to this trial. They are not on trial here. Their situation will be handled independent of this man's. I can assure you none of those cases are going to be dismissed by the State, they will go through the normal channels. (Emphasis ours) [Petitioner's Exh. 1, p. 184]

The Supreme Court of Missouri refused on direct appeal to consider petitioner's complaint "with respect to the prosecuting attorney's argument" for the reason "defendant failed to preserve such alleged error by proper objection during argument" 501 S.W.2d at 162. We do not reach the question because it was not presented in petitioner's habeas petition.

**32.** For reasons which are not apparent in the record, counsel did not call Peak's attention at the time his deposition was taken to his statement to the trial judge in regard to when he talked with Waterman about the fact that Thomas was going to testify as a prosecution witness. Accordingly, Peak's deposition testimony reflects his unrefreshed recollection that

any conversation that he may have had about Henderson and Thomas becoming prosecution witnesses "probably [took place] at the time whoever it was pled guilty to Judge Stubbs." (Peak Deposition, p. 27). Henderson's plea of guilty was accepted on April 12, 1971, six months before petitioner's trial.

We believe it obvious that Peak must have seen the March 4, 1971 Henderson memorandum in petitioner's file as he was preparing for petitioner's October, 1971 trial and that he must have talked with both Houlehan and Waterman shortly before that trial in regard to calling both Henderson and Thomas as prosecution witnesses. It is inconceivable that he would have put either on the stand without making inquiry of their counsel in regard to what testimony each would give when placed on the stand.

**33.** See *Hale v. United States,* 406 F.2d 476, 478–79 (10 Cir.1969), *cert. denied* 395 U.S. 977, 89 S.Ct. 2129, 23 L.Ed.2d 765 (1970) ("Statements made by a party on the witness stand, if adverse to his interest, are considered to be admissions, and as such, they are admissible evidence against the maker in a subsequent criminal prosecution against him;") and *United States v. Cecil,* 457 F.2d 1178, 1181 (8 Cir.1972) ("Statements by a party made voluntarily on the witness stand in a judicial proceeding, if adverse to his interest, are admissible evidence against him in a subsequent criminal prosecution;") *United States v. Anderson,* 481 F.2d 685, 696 (4 Cir.1973), *aff'd.* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 21 (1974) ("Testimony of a defendant, given at another trial or hearing, is admissible, and this is true whether the defend-

not even show up when his client testified against petitioner is convincing evidence that Waterman's confidence in his knowledge of "how the system worked" was so complete that he could not conceive that the plea bargain would not be carried out as it had been negotiated.

■ Thomas, unlike Henderson, had not made any statement to the police in regard to his participation in the arson. Waterman obviously would not have permitted Thomas to waive his Fifth Amendment rights and to give testimony that could subject Thomas to life imprisonment unless he was fully satisfied that Thomas' testimony against the petitioner would never be used against Thomas personally.

Although Waterman was under the initial impression when his deposition was taken that Thomas' plea of guilty had been entered before Thomas testified and perhaps before he had been sentenced (*Id.* p. 6), petitioner's Exhibit 6 establishes that Thomas did not plead guilty until November 1, 1971, a short time after petitioner's trial. Thomas' sentencing was delayed until February 4, 1972, at which time imposition of any sentence was suspended and Thomas was placed on probation for the same four years as had Henderson a month earlier. The transcript of the Thomas February 4, 1972 sentencing proceeding (Petitioner's Exh. No. 4) reflects that Judge Murphy, in apparent accordance with the common practice described by Houlehan, had "talked to counsel," apparently before taking the bench to impose sentence. (*Id.* p. 5). That transcript also shows that when Judge Murphy asked the Assistant Prosecuting Attorney "Is there any recommendation, Mr. Peak?," Mr. Peak stated the following:

> No, I would like to point out in line with the adjustment he has made since the time of his arrest and plea of guilty he has also been very helpful to the State in another trial and was largely responsible for the trial ending in a conviction and sentence of forty years. That trial involved the man who, apparently influenced Mr. Thomas to commit this crime and under those circumstances, the State has no recommendation but we are not opposed to probation in this case.[34]

When the Assistant Attorney General asked Waterman on direct examination as to whether he regarded "what occurred there on the record in the sentencing, looking at what Mr. Peak's remarks were to the judge concerning Mr. Thomas' testimony in the Sims case, . . . as a consummation of a deal . . . struck between yourself and the prosecutor?," Waterman answered, "Yes, I think it would." (Waterman deposition, p. 8).[35]

We are satisfied from all the facts and circumstances that Waterman's understanding that the "deal struck between

---

ant elects to testify in his own defense or not, . . . and whether he appeared as a defendant or witness, . . . . It is of no moment whether the former trial was for the same offense or for some other, . . . or whether the trial was a criminal or civil proceeding.") [citation of numerous cases omitted].

**34.** Judge Murphy, in an obvious reference to Henderson's sentencing, confirmed on the record that "in one of the other Divisions, imposition was suspended on another young man who was involved in this." Judge Murphy also advised Thomas that if he ever got "in more trouble you will be brought back and sentence will be imposed." (Ibid. p. 6). Although the record shows that Waterman "represented young Thomas about two years later on another charge," (Waterman Deposition, p. 4) it does not show whether Thomas was convicted on that charge or whether, if so, the State made

any effort to revoke the probation granted on February 4, 1972.

**35.** *Shepard v. State*, 549 S.W.2d 550, 553 (Mo. App.1977) indicates that a plea bargain that "the state would make no recommendation as to sentence" was of substantial benefit to a defendant under the plea bargaining system in effect in the Circuit Court of Jackson County, Missouri, prior to the time the Supreme Court of Missouri required all plea bargains to be stated on the record. An agreement that the prosecution would make no recommendation would assure a defendant that the trial court would not be required to reject a prosecutor's recommendation, which except for the plea bargain agreement, the prosecutor would be free to make. Experience establishes that some judges simply do not like to reject a prosecutor's recommendation.

[himself] and the prosecutor" was consummated at the time of sentencing accurately reflects the existence of a plea bargain between Waterman and the prosecutor's office which was, in fact, consummated when Thomas was placed on probation in consideration of the testimony he had given as a key prosecution witness at petitioner's trial. It is obvious that we are satisfied that petitioner's objections to the magistrate's proposed findings Nos. 35, 36, and 37 which, in effect, do no more than reflect Waterman's obvious lack of familiarity with *Santobello* and his erroneous legal conclusion that the plea bargain he had negotiated with the prosecutor's office was not "binding," must be sustained.

We accordingly find and conclude, as a result of our *de novo* consideration of the record, that Thomas, like Henderson, was the beneficiary of a plea bargain negotiated by his counsel with the prosecutor's office and that the existence of the plea bargain was concealed from the petitioner at the time of petitioner's trial. We further find and conclude that Thomas' testimony given both out of and in the presence and hearing of the jury (Petitioner's Exhibit 1, p. 62–64, 64–65) to the general effect that his testimony as a key prosecution witness was being given without any promises of any kind can not properly be considered as supporting a finding that no promises were in fact made in exchange for that testimony. We have heretofore concluded that Mr. Peak's testimony may not properly be relied upon to support an ultimate finding that no promise was made to obtain the testimony of Henderson. We make the same finding and conclusion in regard to Mr. Peak's testimony in regard to Thomas.

Our *de novo* consideration of all of the facts and circumstances in regard to Thomas' testimony requires that we find that his testimony was given pursuant to a plea bargain under which he was eventually placed on probation without the imposition of any sentence in exchange for his testimony as a key prosecution witness against the petitioner.

We turn now to the law applicable to this case.

## VII.

### A.

Both *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) and *Giglio v. United States*, 405 U.S. 150, 152, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972) were decided before the Supreme Court of Missouri considered the petitioner's direct appeal in *State v. Sims*, 501 S.W.2d 161. The Supreme Court of Missouri, however, refused to consider the merits of petitioner's federal constitutional claim for the reason that "complaint was not presented to the trial court" and because there was "nothing in the record to suggest that the prosecuting attorney had made any promises to or agreements with the witnesses with respect to their future prosecution." 501 S.W.2d at 162.[36] It is thus clear that the Supreme Court of Missouri's conclusion on petitioner's direct appeal that "the rule in *Giglio v. United States, supra,* has no application to this case" was based solely on that court's refusal to consider the merits of petitioner's federal constitutional claim on technical procedural grounds alone.

This case vividly illustrates the not infrequently occurring consequences which follow in the wake of judicial action which attempts to sweep prisoner cases under the rug on procedural grounds. For it is clear that if the Supreme Court of Missouri had directed appropriate proceedings to reach the merits of petitioner's federal claim at the time it considered petitioner's direct appeal in 1973, that court would have been under duty to follow and apply the federal constitutional principles stated in the lead-

**36.** Petitioner unsuccessfully attempted to supplement the trial transcript on direct appeal with exhibits which reflected the fact that both Henderson and Thomas had been placed on probation on January 6, 1972 and February 3, 1972 shortly after petitioner's trial had been concluded. The Supreme Court of Missouri, however, refused to consider those records on direct appeal or to direct further proceedings which would have permitted consideration of the merits of petitioner's federal claim.

ing Missouri case of *State v. McClain,* 498 S.W.2d 798 (Mo.Sup. en banc 1973). *McClain* was decided by the Supreme Court of Missouri en banc on September 10, 1973, approximately one month *before* the judges of Division No. 1 adopted the commissioner's opinion affirming petitioner's conviction in *Sims* on November 12, 1973.

In *McClain,* the Supreme Court of Missouri noted that the defendant had been convicted of first degree murder and that his punishment had been assessed at death. The court stated that "the testimony of two witnesses, Joanne Lewis and Larry Smith placed appellant in the alley at the time of the death" and that Larry Smith, who testified as a key prosecution witness, had also been charged with the murder of Jeanneta Mitchell." *Id.* at 798.

It is a truly ironic circumstance that McClain's murder trial in the Circuit Court for Criminal Causes in the City of St. Louis was being conducted on exactly the same day that petitioner was being tried for arson in the Circuit Court of Jackson County. The *McClain* court noted that "on the morning of October 19, 1971, before court convened, the Chief Trial Assistant to the Circuit Attorney dismissed the case against Larry Smith" and that "Smith testified later that morning" *Id.* 800. Larry Smith, the State's key prosecution witness in *McClain,* as Henderson and Thomas, the key prosecution witnesses in petitioner's trial, denied he had received any promises of leniency from the prosecution.

Chief Justice Donnelly properly concluded in *McClain* that "the disposition of this appeal is determined by application of the law stated in *Napue v. Illinois,* 360 U.S. 264, 269, 270, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959),[37] and *Giglio v. United States,* 405 U.S. 150, 153,[38] 154, 92 S.Ct. 763, 765, 766, 31 L.Ed.2d 104 (1972)." [498 S.W.2d at 799].

Both the facts presented in *McClain* and the proper application of *Napue* and *Giglio* to those facts were succinctly stated by Chief Justice Donnelly in the final paragraph of his opinion as follows:

Larry Smith is the only witness who testified that he saw appellant assault Jeannetta Mitchell. Smith's "credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." *Giglio v. United States, supra,* 405 U.S. 150, 154, 155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104. The failure of the prosecutor to disclose that the charge against Smith had been dismissed requires a new trial under the due process criteria of *Napue* and *Giglio.*

Chief Justice Donnelly appropriately emphasized in his summary of *Giglio* that one assistant prosecutor had *presented the case to the grand jury* and that a different prosecutor had *tried the case.* The facts of *Giglio* established that it was the first prosecutor who had promised the witness that he would not be prosecuted "if he cooperated with the Government." 405 U.S. at 153, 92 S.Ct. at 765. *Giglio,* as had *Santobello* two months earlier, concluded that the failure of the first prosecutor "to inform his superiors or his associates of his promise to the witness was not controlling." *Id.* 154, 92 S.Ct. at 766. *Giglio* held that:

---

**37.** Chief Justice Donnelly accurately summarized *Napue's* factual circumstances and holding by stating that "In *Napue,* the principal state witness testified that he had received no promise of consideration in return for his testimony. The Assistant State's Attorney had in fact promised the witness consideration, but he did nothing to correct the false testimony. The Court held that "the failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment to the Constitution of the United States."

**38.** Giglio's facts and holding were accurately summarized in *McClain* as follows: "In *Giglio,* the principal state witness testified that he had received no promise of consideration in return for his testimony. In fact, the Assistant United States Attorney, *who presented the case to the grand jury,* did promise the witness consideration. The Assistant United States Attorney, *who tried the case,* was unaware of the promise. (Emphasis the court's)

The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government.... To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it.[39]

*Giglio* accordingly concluded that because "the Government's case depended almost entirely on Taliento's testimony; [his] credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." The Court therefore held that, for the reasons stated by the Court, "the due process requirements enunciated in *Napue* and the other cases cited earlier require a new trial, and the judgment of conviction is therefore reversed and the case is remanded for further proceedings consistent with this opinion."

## B.

Missouri appellate courts have consistently applied the principles enunciated in *McClain* and *Giglio* to all cases in which those courts have reached the merits of the federal constitutional question presented.

*State v. Koonce,* 504 S.W.2d 227 (Mo.App. 1973) and *State v. Summers,* 506 S.W.2d 67 (Mo.App.1974) reversed convictions obtained by the prosecutor's concealment of promises of leniency made to key witnesses who, like the key witnesses in this case, were actual participants in the crime.[40]

*State v. Brooks,* 513 S.W.2d 168 (Mo.App. 1973) involved a conviction for assault with intent to maim with malice, described as a "vicious, detestable and unprovoked blinding of a seventeen year old girl, and robbery which had generated considerable press coverage, both locally and nationally." *Id.* at 170. The State relied upon the testimony of one Harper, who, like the key witnesses in this case, was "charged with exactly the same offenses as defendant." *Id.* at 172. Harper, the State's key prosecution witness, consistently denied that any "deals" or "discussions" had been made "for his testimony." *Id.* 173. The week following the trial Harper was permitted to enter a plea to a lesser offense, "sentence was suspended and he was placed on probation." *Id.* 173.

*Brooks* reversed and remanded for a new trial. The *Brooks* court appropriately noted that *"Napue, Giglio,* and *McClain* reach beyond the element of known false testimony." *Id.* at 173. That court explained that "As the judicial process has developed from its 'sporting contest' aspect into its present

**39.** In *Giglio,* the Supreme Court cited § 201(d) of the American Bar Association, Project on Standards for Criminal Justice, Discovery and Procedure Before Trial, with approval. That section provides that "the prosecuting attorney's obligations under this standard extend to material and information in the possession or control of members of the prosecutor's staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or, with reference to the particular case, have reported to the prosecutor's office."

**40.** *Koonce* held that "the testimony of witnesses Verderber and Rhoden, that they had received no promises of assistance or leniency from the prosecutor's staff in return for their cooperation and testimony, was false ... and it was the duty of the prosecutor in the case at bar to correct the false testimony. His failure to do so denied the defendant due process of

law in violation of the Fourteenth Amendment of the Constitution of the United States." *Koonce* also held that "this result ensues even though the assistant prosecuting attorney may have acted in good faith in that he may not have had actual knowledge of the arrangement made by his superior with these witnesses."

The same three accomplice witnesses were used by the State in *Summers* to obtain the defendant's conviction in that case. The circumstances of *Summers* were further aggravated by the assistant prosecuting attorney's statement to the trial court that defense counsel "is always hollering about a deal and he knows damn well there hasn't been any deal made" with the State's three key witnesses. *506 S.W.2d at 71.* The *Summers* court, like the *Koonce* court, relied upon *Napue, Giglio,* and *McClain* in reversing and remanding the case for a new trial.

'quest for truth' aspect, the courts have recognized that access to information in the hands of the opposing party is vital to the proper functioning of the process." The court added that "We must also recognize that incentives to testify are normally the product of discussions between prosecuting officials and the witness or his counsel."

The *Brooks* court properly concluded that prosecuting attorneys occupy a different position from that occupied by counsel for a prosecution witness and that "it is not simply [the prosecutor's] duty to obtain convictions, but to see that justice is done." *Id.* 174. Discharge of that duty, the *Brooks* court held, requires a prosecutor "to make timely disclosure to counsel for the defendant ... of the existence of evidence, known to the prosecutor or other government lawyers, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment." *Id.* at 174. *Brooks,* in reliance upon *Napue, Brady v. Maryland,* and *McClain,* held that "suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution" and that "the obligation of the prosecutor to make disclosure is not changed because the crime is heinous, the public outrage is great, or the press pressure for a conviction is substantial."[41]

In *Brooks,* the State contended that no firm deal had been negotiated at the time Harper testified and that "negotiations continued until after Brooks' trial." Id. 174–75. The court properly concluded that the State's argument "misses the mark" for the obvious reason that "nothing in the record indicates the prosecutor believed Harper was unaware of the deal offered and all logic would make him believe Harper did know;" and because "the denial of due process and of a fair trial here is the intentional refusal of the prosecutor to disclose a proffered favorable disposition of Harper's indictments in return for his testimony." We find and conclude that the same principle is applicable to the factual circumstances of this case.

The recent decision of the Supreme Court of Missouri in *State v. Patterson,* 618 S.W.2d 664 (Mo.Sup. en banc 1981) suggests that the recent adoption of Missouri Rule 25.03(A)(9) by the Supreme Court of Missouri on June 13, 1979, effective January 1, 1980, will go a long way toward preventing the recurrence of the sort of factual situation presented in this case. That rule places the mandatory duty upon the state to disclose to defense counsel "any material or information, within the possession or control of the state, which tends to negate the guilt of the defendant as to the offense charged, mitigate the degree of the offense charged, or reduce the punishment."

*Patterson* reversed and remanded a conviction for capital murder for the reason that, in violation of new Rule 25.03(A)(9), the state failed to disclose that it had agreed to dismiss charges against a prosecution witness "in exchange for his testimony against defendant." *Id.* at 665. The *Patterson* court stated that under the circumstances, "a lengthy recitation of the facts is unnecessary" and reversed and remanded for the reason that under *McClain,* the fact that the prosecution witness "made a deal with the prosecutor is important in judging his credibility and the jury was entitled to know about it." Id. 665. Missouri Rule 25.03(A)(9), as construed in *Patterson,* brings Missouri's rules in full compliance with the principles stated in *Giglio.*[42]

**41.** The *Brooks* court added that "the special circuit attorney apparently thought it was." *Id.* 174. The court stated the reasons why the prosecutor had a distorted view in the final paragraph of its opinion. It there stated:

For some the decision we here render will be an example of "permissiveness" and lack of concern for the public by the judiciary. But no matter how heinous the crime, the fact of its commission alone cannot establish the guilt of the defendant. No matter the seriousness of the crime, the defendant on trial for its commission is entitled to a fair trial in which the jury has before it the facts upon which to make a reasoned and intelligent decision. When those facts have been suppressed by the State, the defendant has received an inquisition, not a trial. We cannot and will not permit our system of justice to be so perverted.

**42.** In *Giglio's* discussion of the duty of the second prosecutor to disclose the fact that the

■ Application of the principles of law stated requires that we sustain petitioner's basic objection to that portion of the magistrate's report which proposed that this Court make an "ultimate finding of fact that no promises were made Roderick Henderson and John L. Thomas in exchange for testimony at the Sims trial" (page 16 of the magistrate's report). We find and conclude on *de novo* determination that promises were in fact made those key prosecution witnesses; that such promises were unlawfully concealed from the petitioner and his counsel; and that petitioner suffered obvious prejudice in being deprived of his right to appropriate cross examination of two key prosecution witnesses and was accordingly deprived of due process and a fair trial under the cases above discussed.

## VIII

For the reasons stated, it is

ORDERED (1) that petitioner should and will be granted appropriate federal habeas corpus relief. It is further

ORDERED (2) that petitioner's conviction should be and the same is declared to be null and void, the same having been obtained in violation of the rights guaranteed by the Constitution of the United States and that petitioner is entitled to a new trial under the circumstances of this case. It is further

ORDERED (3) that execution of this Court's writ of habeas corpus shall be stayed for a period of thirty (30) days within which time, or such additional time as may be granted for good cause shown in writing before the expiration of the time stated, the State of Missouri may grant petitioner a new trial and commence such new trial for the offense involved in this case.

first prosecutor had promised the government's key prosecution witness that he would not be prosecuted if he cooperated with the Government, Chief Justice Burger cited Section 3.11(a) of the American Bar Association, Project on Standards for Criminal Justice, Prosecution Function and the Defense Function, in addition to *Brady v. Maryland* and other Supreme Court cases. The cited Standard, entitled "Disclosure of evidence by the prosecutor," states: "(a) It is unprofessional conduct for a prosecutor intentionally to fail to make disclosure to the defense, at the earliest feasible opportunity, of the existence of evidence which tends to negate the guilt of the accused as to the offense charged or which would tend to reduce the punishment of the accused."